R. T. HARRIS V. THE STATE.

No. 23337. Delivered October 30, 1946.
Rehearing Denied January 8, 1947.

*Scarborough, Yates & Scarborough,* of Abilene, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

The killing here depicted is both tragic and pathetic—tragic, in that the life of a fine sixteen-year-old high school student was forfeited; pathetic, in that death was caused by the carelessness and negligence, with no intent to kill, of a seventy-three-year-old retired farmer-preacher, who had never before been charged with a violation of the law and who had always borne a good reputation as a law-abiding citizen.

The Park Board of the City of Abilene operates Fair Park. Among the buildings in the park was one known as the "Youth Center," where young people could and did meet for amusement and entertainment. Mrs. Austin was the director and in immediate charge thereof.

Appellant was employed as a night watchman in the park. As a part of his duties, he was to look out for and prevent fire to the buildings.

On Hallowe'en night, October 31, 1945, quite a crowd of young high school students were gathered in the "Youth Center." As is customary on such night, they were indulging in much frivolity, including the striking of matches, shooting of firecrackers, and the bursting of torpedoes inside the building. The danger of fire attracted appellant's attention and he went over and into the building; he found much smoke therein. He and Mrs. Austin, the director, decided that the danger of fire was so great as to require closing the building. The young people

were requested to and did—with some degree of reluctance—leave the building, after which Mrs. Austin closed it.

Appellant went out of the building with them and after the door was closed, appellant stood in the doorway or alcove. While standing there, firecrackers, torpedoes, and water bombs were thrown and exploded around him and the building and some of the boys, endeavoring to re-enter the building began to yell, "We want in! We want in!" Appellant says there were twenty or twenty-five boys around in front of him. One State's witness said there were fifty or more boys outside the building. Other witnesses said there were some girls, also, in the crowd.

The deceased, Hershel Jeter, was among those present. There is no testimony showing that he was an active participant in the shooting of the fireworks, or that he was doing anything in particular. About all the testimony regarding him is that he was in the crowd.

There is no suggestion in the testimony that the appellant knew Jeter or that Jeter had said or done anything to the appellant whereby appellant might have had any animosity or ill-feeling towards him.

Up to this point, the facts are not materially disputed. Four of the boys present testified for the State. Two of these were sixteen years of age. The ages of the other two were not stated.

As to what happened immediately before and at the time of the shooting, the witness Jones testified:

"At the time of the shooting Mr. Harris (appellant) was standing right nearly inside of this little hallway-looking-thing before you go in the door. That is in the Youth Center building. Mr. Harris was talking to a bunch of boys and I just walked up and he told them to quit shooting fire works and everything and when he walked back to the door and came back out some boy squirted some water and got a.lot on me and a lot on everybody else. This was not a water squirt gun. Then he drew the gun and fired. I saw Mr. Harris draw the gun. He reached down to his side and tried to pull it out. I think he put his left hand to his holster and drew it out and then he fired. When he drew the gun out he kind of shook it a couple of times, like he was nervous. When he shot the gun was pointed kind of Southeast or West; East I think. It was pointing straight."

The witnesses Austin and King corroborated the testimony of Jones, as well as the State's theory that when appellant fired the pistol it was not pointed down but on a level or straight line.

As a result of the pistol shot, Herschel Jeter was killed, the bullet passing through his arm and into his stomach.

The State introduced in evidence a statement the appellant made after the shooting, viz.: "I opened the door and went outside—I pulled my gun and shot to scare the boys."

Appellant, testifying as a witness in his own behalf, denied knowing the deceased and an intent to kill. He said that he drew his pistol and fired the shot down "right at my feet" to scare the boys into leaving, and to prevent further shooting of fireworks in and around the building. He testified:

"I was exercising my best efforts to try to get the boys to leave there and not burn up that building. That is all; to get away. I did not have any other motive, other than to try to save that building from fire, in trying to get those boys out of the building and away from it." Appellant denied having fired the pistol while holding it level or "straight out" and said that if the pistol was fired while in that position it was entirely accidental.

An examination of the concrete walk where appellant was standing when he claimed to have fired the shot at his feet failed to reveal any evidence of a bullet mark thereon. The distance between appellant and deceased when the shot was fired was twelve or fourteen feet.

Upon the facts stated, appellant was convicted of negligent homicide of the second degree and his punishment assessed at confinement in jail for a term of two years.

The unlawful act alleged in the indictment, as a basis for the accusation of negligent homicide and upon which the conviction rests, was that "the said R. T. Harris was then and there unlawfully attempting and was in the act of committing an assault upon Herschel Jeter." The effect of that allegation was to charge appellant with a simple assault upon the deceased. Such allegation is of commanding importance in determining this appeal.

The sufficiency of the evidence to support the conviction is challenged by appellant.

Negligent homicide of the second degree arises primarily out of the facts showing a homicide which occurs in the performance of an intended unlawful act not arising above the grade

of a misdemeanor, with no intent to kill. 22 Tex. Jur., p. 584, Sec. 102; Egbert v. State, 76 Tex. Cr. R. 663, 176 S. W. 560.

An accidental killing arises when the act which causes the death was unintentionally done. Egbert v. State, supra.

So then, in a broad sense, a distinguishing element between negligent homicide and accidental killing lies in the fact that, in the first, the act which causes death must be intentionally done, while in the other, the act which causes the death was unintentional.

It is also well settled that in negligent homicide of the second degree the unlawful act relied upon must not be above the grade of a misdemeanor. If it be of the grade of a felony, then negligent homicide does not arise. Art. 1241, P. C.

It is under these rules that the facts must be analyzed, to determine the legal sufficiency thereof.

We take, first, the testimony of the State showing that appellant, while holding the pistol in a level or "straight out" position, intentionally fired the pistol at close range at or into the crowd of young people. A shooting under such circumstances evidences such wanton and reckless disregard of the lives of others as to constitute as murder upon implied malice the killing of one present and in the crowd so fired into. Banks v. State, 85 Tex. Cr. R. 165, 211 S. W. 217, 5 A. L. R. 600; Cockrell v. State, 135 Tex. Cr. R. 218, 117 S. W. 1105.

Murder, being a felony, could not furnish the unlawful act or assault necessary to constitute negligent homicide of the second degree.

If appellant fired the pistol accidentally while holding it in a level or "straight out" position, he did not intentionally do so and therefore could not be guilty of negligent homicide.

The remaining question, then, is whether the act of appellant in shooting his pistol down at his feet to alarm or scare warranted the jury's finding that he thereby committed an assault upon the deceased.

In submitting this feature of the State's case, the jury were instructed that "the use of any unlawful violence upon the person of another with intent to injure him, whatever be the means or degree of violence used, is an assault and battery. Any attempt to commit a battery or any threatening gesture showing, in itself or by words accompanying it, an immediate intention

coupled with an ability to commit a battery is an assault." Such charge followed the provisions of Art. 1138, P. C.

Among the exceptions to this charge reserved by the appellant was that there was no evidence to authorize it.

Under the definition of assault and as given in the charge to the jury, an intent to injure is an essential element, without which there can be no assault.

So, for appellant to be guilty of an assault upon deceased—as submitted to the jury—the intent on the part of the appellant to injure the deceased must have existed at the time he fired the shot down at his feet, if he did. This was one of the acts the State relied upon to show the appellant guilty on an assault. The mere fact that the bullet from the pistol richocheted or glanced after striking the concrete walk and struck the deceased would not—of itself—evidence the intent necessary to constitute the assault which the State relied upon, and as submitted to the jury.

We are constrained to agree with the appellant that the facts do not warrant the jury's conclusion that at the time appellant fired the pistol down at his feet, if he did, he intended to injure the deceased.

It is apparent, then, that the facts are insufficient to show that appellant committed or was in the act of committing an assault upon the deceased, as submitted by the trial court in his charge to the jury.

Our attention is directed to the fact that one may be guilty of an assault by shooting to scare. This is made so by that part of Sec. 3 of Art. 1141, P. C., which reads as follows:

"But the use of any dangerous weapon, or the semblance thereof, in angry or threatening manner, with intent to alarm another, and under circumstances calculated to effect that object, comes within the meaning of an assault."

Whether such article may be here utilized by the State to sustain the accusation that appellant made an unlawful assault upon the deceased is not before us, because the case was not submitted to the jury upon that theory. Upon this question, attention is called to the case of Trimble v. State, 57 Tex. Cr. R. 439, 125 S. W. 40; Smith v. State, 114 Tex. Cr. R. 534, 26 S. W. (2d) 1069.

We are, here, passing only upon the accusation as laid in the instant indictment and as submitted to the jury.

As thus analyzed, we conclude. that the State's testimony fails to establish appellant's guilt as charged in the indictment.

The maximum punishment authorized for negligent homicide of the second degree is three years' imprisonment in jail. Art. 1242, P. C.

Appellant assails as unconstitutional that statute, insisting that the maximum punishment authorized to be inflicted by a county court—where negligent homicide cases are to be tried—cannot exceed two years' imprisonment in jail. We are unable to agree with appellant.

The Constitution of this State places no such limitation upon the Legislature. The Legislature was therefore authorized to fix such punishment as it deemed proper to misdemeanors, so long as it did not include a term in the penitentiary.

Under the provisions of Art. 47, P. C., "an offense which may—not must—be punishable by death or confinement in the penitentiary is a felony; every other offense is a misdemeanor."

For the reasons stated, the judgment of the trial court is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON STATE'S MOTION FOR REHEARING.

KRUEGER, Judge.

The State, by and through its County Attorney, has filed a motion for a rehearing in which he claims that we erred in several respects in the disposition of this case.

We have again reviewed the record in the light of the motion but see no good reason for receding from the conclusion expressed in the original opinion.

Believing that the case was properly disposed of, the motion for a rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.