**Lloyd A. SIMON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 45417.**

Court of Criminal Appeals of Texas.

Dec. 6, 1972.

Rehearing Denied Jan. 17, 1973.

Isaac Edwin Henderson, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and I. D. McMasters, Asst. Dist. Attys., Houston, and Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for murder. The jury assessed the punishment at life.

The indictment alleges that Lloyd A. Simon with his malice aforethought killed Lorraine Griggs by striking and beating her with his fists and in some way or manner and by some means, instruments and weapons to the grand jury unknown.

The main contention of the appellant is that the trial court erred in refusing to submit an instruction to the jury concerning an exculpatory statement.

The summary of the facts in the State's brief, prepared by the Honorable James C. Brough, Assistant District Attorney of Harris County, is adopted (with references to page numbers omitted) and is as follows:

"Barbara Jean Broussard and appellant, Lloyd Simon, were engaged to be married on October 31, 1969. She had known appellant about 5 years. Mrs. Broussard worked for appellant in a business known by the name of Home Beautifiers which business appellant owned. On November 10, 1969, Mrs. Broussard owned a home at 3324 Palm Street in Houston, Texas. Lloyd Simon had the freedom of coming and going there as he wanted to, in fact, he kept clothes there—some clothes being located in the downstairs closet and some of them upstairs. At that time, Mr. Simon was married and his wife was living in Lake Charles, Louisiana.

"Mrs. Broussard, on November 10, 1969, knew Lorraine Griggs, deceased in the case

at bar and had known her almost a year. They met at the Home Beautifiers' Office. Mrs. Griggs also was employed by Mr. Simon and the two women worked in the office together. The relationship between the three generally was a friendly relationship as well as a business relationship. On November 10, 1969, Mr. Simon was at Mrs. Broussard's residence. About 8:35 p. m. Mrs. Broussard and Lorraine Griggs arrived there after going to a customer's house in the Acres Homes area to get some papers signed. When they arrived at the house, appellant was standing in the kitchen, in front of the stove, wearing a gold terry cloth robe. Mrs. Broussard saw no trousers under the robe. It was a short robe being about knee length. He was wearing slippers. She could see no shirt under the robe. Appellant was looking at the barbeque and some beans on the stove. Both the women had been working that day. Mrs. Griggs had spent the weekend with Mrs. Broussard and had some things still at her house, including a small overnight case. Mrs. Griggs was wearing a gold and white flowered designed dress.

"When they arrived, Mrs. Broussard kissed appellant. The Hi-Fi was playing records. They sat down at the table and Mr. Simon served some eggnog. Then he suggested that Mrs. Broussard change clothes. He didn't say anything about Mrs. Griggs changing clothes. Mrs. Broussard went to the bedroom and changed and then returned. Presently the music stopped playing. The stereo was located in the study which was in the back of the house beside the back bedroom. Mr. Simon suggested that Mrs. Griggs check the box and put on some more music. To get to the study from the kitchen, Mrs. Griggs had to go through the hall first, then the living room, then to the study. Mr. Simon followed her. Mrs. Broussard stayed in the kitchen. She heard a kitchen door being closed, as Mr. Simon went out, between the hall and the kitchen. This seemed strange to Mrs. Broussard. She could hear some talking and laughter which appeared to be coming from the study area. With the music playing the noise seemed to have gotten a little louder, the talking a little louder. There was no long laughter. It seemed like they might have a disagreement or argument. Their voices were raised.

"Mrs. Broussard picked up her keys which were on the bar and walked outside through the front door. She did not want to be in an argument if there was one because she was afraid of Mr. Simon.

"There is a driveway around the side of the house, on the East side, and her car was there. She went to the car to leave but she did not get in the car because she was afraid it wouldn't start since she had been having battery trouble. Instead, she stayed there in the yard. Presently she heard Mr. Simon calling her name in a loud and angry manner.

"Mrs. Broussard started to the back door to the study. She heard Mr. Simon calling her name again. It was still loud and angry. She continued to go toward the back door. She tried to open the door. It was opened a little and then slammed again.

"Mrs. Broussard started toward the front of the house on the driveway side, and again heard Mr. Simon call her name, loud and angry. She could hear him walking. It seemed like he was coming to the front end of the house. When she heard him apparently heading for the front of the house, she turned around and went back to the study so that she was going away from him instead of toward him. When she got to the back of the house she met Mrs. Griggs who was coming out the back door. They said nothing to each other. Mrs. Griggs stood there by the gate. Mrs. Broussard went into the house through the study door and went up the stairs. She went into her little girl's room and out the window and on to the roof. Then she went on over to a smaller part, on an offset over the kitchen and over a porch, this being a flat roof. She went to that portion of the roof so that she couldn't be seen because

she was afraid of Mr. Simon and didn't want him to find her.

"While she was doing this, she heard Mr. Simon ask Mrs. Griggs for Mrs. Broussard. Mrs. Griggs replied, 'She just passed.' Then Mrs. Broussard heard Mrs. Griggs say, 'No, Mr. Simon.' She said this rather loud.

"Mr. Simon said, 'Oh, you are bad.'

"Then it sounded as if they went inside. Mrs. Broussard heard a door slam. She could hear some noises and knew the box was still playing music. The noises were like something falling either on the floor or the wall or a tussling or something and these noises lasted 15 or 20 minutes. The noises seemed continuous. The sounds were distinct. Mrs. Broussard heard Mrs. Griggs say, 'No, Mr. Simon,' again, inside the house. It was very loud. It sounded like she really meant 'No' whatever it was. A very loud and distinct, 'No, Mr. Simon.' It was silence from then on. The witness had a lot of fear and all she remembered after that was being awakened by someone trying to hold onto her sometime later, with her still on the roof. Officers were shaking her or attempting to revive her and took her into the house.

"J. H. Carr, a Houston Police Officer, on November 10, 1969, went to 3324 Palm Street, an a radio call, together with his partner, Officer T. L. Rhodes, at approximately 11:03 p. m. arriving at approximately 11:10 p. m. When they arrived, there were a number of people standing in the front yard and an ambulance was parked at the curb and the front door to the house was open. The officer went in and saw appellant Lloyd A. Simon. Simon was in a hallway between the dining room and the kitchen and the living room. With him were two ambulance attendants. A woman was lying on the floor. Appellant told the officer the woman was Lorraine Griggs. The woman was lying on the floor on her back. The ambulance attendants were attempting to apply first aid, using oxygen and other first aid equipment.

"There was quite an amount of blood on the woman's face, head and hair. Her face was badly swollen and her eyes were swollen shut. The officer checked for breathing and could detect no breathing by the woman. He checked her pulse and found no pulse whatsoever. He formed the opinion that the woman was dead at the time. In the presence of appellant, he had a conversation with the ambulance attendants and they stated their opinion that the woman was dead.

"Appellant Simon was not at that time under arrest and was actually later allowed to go in the ambulance with the deceased. He gave it as his opinion that someone had broken into the house and burglarized and beat Mrs. Griggs up. He told the officers the house belonged to Barbara Broussard.

"The officer made a careful search for any evidence of a forced entry on the outside of the house and could find none. The officer, however, did find a broken door inside the house between the den and the living room.

"The officer observed a small cut on the palm of appellant's right hand, a blood blister on appellant's right thumb, scratch marks on the back of appellant's left hand and on the inside of appellant's left arm and also on the inside of appellant's right ankle. Each set of scratch marks were in series and were parallel. In each case, none were bleeding. The house was in shambles except for the upstairs and the front part of the living room and the dining area. The officer found a gold bathrobe in the back bedroom across the bed. It appeared to have bloodstains on it. There was a gold and white dress in the bathroom. There was a fireplace poker just inside the living room and a fireplace shovel was lying in the hallway.

"Appellant was dressed in bedroom slippers, a pair of pants and a shirt. Later it was proved by a chemist that there was human blood on the bathrobe and that there was blood on the poker and on the shovel.

"Officer W. L. Young, a homicide detective for the city of Houston, and his partner, Detective Todd, who investigated the crime, found Barbara Broussard on the roof of the house on its extension over the first floor level. She appeared to be unconscious. Officer Young leaned out the window and called her by name. At first there was no response. He was afraid she would fall off and reached out the window and touched her. She started shaking violently and appeared to be hysterical or in shock. The officers got her in the house through the window.

"Dr. Joseph Jachimczyk, Chief Medical Examiner for Harris County, testified that he performed an autopsy on Mrs. Griggs and the cause of death was blood trauma to the head resulting from something that struck her in the head or which her head struck, and a dislocated neck with mild compression of the cervical spinal cord. It was the doctor's opinion that the deceased was beaten, judging by the nature and extent and distribution of the injuries on her body. He testified that the injury could have been inflicted by the fireplace poker or shovel."

█ Before the charge was read to the jury, counsel for appellant objected because the court did not charge on "exculpatory statements." He argues that the oral statements made to Officer J. R. Carr at the scene, to the effect that a burglar had broken in and beaten Lorraine Griggs, were introduced by the State thereby requiring such a charge.

This objection was sufficient to call the matter to the attention of the trial court. Was the appellant entitled to such an instruction?

Counsel for the appellant, in an able argument before this Court, relied upon McIntire v. State, Tex.Cr.App., 431 S.W.2d 5; Cavazos v. State, Tex.Cr.App., 365 S.W. 2d 178, and others. He also candidly pointed out that cases of Davis v. State, Tex. Cr.App., 474 S.W.2d 466, and Brown v. State, Tex.Cr.App., 475 S.W.2d 938 (1971), were apparently against his contention.

Naturally, he urges that the Cavazos case should be followed.

In Brown v. State, supra, the conviction was for the murder of his parents. This Court held that a statement of Brown in an interview with the district attorney that he came home shortly after 5 p. m. on the date in question and changed clothes and when he left his father was "still in the fields" wearing coveralls and that he (Brown) did not know how blood had gotten on his shirt when it was shown to him was not exculpatory. The Court stated:

"We do not view either of these statements, introduced by the State, as being exculpatory so as to require the charge requested. See McClelland v. State, Tex. Cr.App., 389 S.W.2d 678. As in Gibson v. State, 53 Tex.Cr.R. 349, 110 S.W. 41, 48, *there is no admission or statement admitting the killings but seeking to justify and excuse the same.* The same statements were offered by the State 'as tending to show the account given by appellant was untrue, known to him to be untrue, and therefore incriminating evidence against him, in that they show an effort and scheme to shield himself from the force and effect of his presence at the scene of the homicide and other facts tending to connect him with the murder.' See also Asner v. State, 138 Tex.Cr.R. 420, 136 S.W.2d 822, 826; Grady v. State, Tex.Cr.App., 466 S.W.2d 770." (emphasis supplied.)

In Davis v. State, supra, the conviction was for burglary of a service station building. When an officer testified that when he arrived Davis said, " . . . he (Davis) came in to get some gas and that it looked like somebody had broken into the office." There the Court held that the statement did not amount to an admission and, therefore, there was nothing that required an exculpation from fault or guilt.

█ We again hold that a statement must amount to an admission plus an assertion that would exculpate an accused before such a charge is required. To the extent that Cavazos v. State and McIntire

v. State, supra, and other cases are in conflict with this holding, they are overruled.

The dissent cites many cases and states that their holdings are attacked. With the exception of the Cavazos and McIntire cases, supra, the holdings of the other cases are not attacked.

For example, in Robidoux v. State, 116 Tex.Cr.R. 432, 34 S.W.2d 863, the accused told the father of the deceased sons, " . . . that he had killed both of his sons; that he had to kill them to save himself. . . . " This was an admission plus an exculpatory statement.

In Otts v. State, 135 Tex.Cr.R. 28, 116 S. W.2d 1084, on motion for rehearing and in an opinion by Judge Hawkins, it is written:

> "[T]he rule in Robidoux' Case, supra, seems a just and fair one, but should be stated with the qualification now to be indicated. Where the defendant does not testify in the case, and where the State in developing its case in chief introduces in connection with a confession or admission of the defendant an exculpatory statement which if true would entitle him to an acquittal, the jury should be told that he is entitled to a verdict of not guilty unless such exculpatory statement has been disproved or shown to be false by other evidence in the case."

It should be noted in Otts, supra, that an exculpatory statement was introduced in connection wtih a confession or admission.

Medina v. State, 164 Tex.Cr.R. 16, 296 S.W.2d 273, cited in the dissent, was reversed because of the insufficiency of the evidence. It was not reversed on the court's charge.

In the other cases that were reversed and cited in the dissenting opinion, there was some statement that incriminated or had an admission or confession. The statements in those cases were not totally exculpatory as in the present case. See Grady v. State, Tex.Cr.App., 466 S.W.2d 770.

This opinion is not changing the rule but it is being applied as it has always been with the exception of the two cases already mentioned and overruled.

Next, the appellant contends that the evidence is insufficient to support the conviction and is against the law and the evidence.

■ He insists that the evidence does not prove the allegations of the use of means, instruments and weapons to the grand jury unknown. Sam E. Drake, foreman of the grand jury which returned the indictment, testified that the grand jury was not able to determine what was used and that the investigation by the grand jury did not result in the discovery of the means or the weapon that caused the death of Lorraine Griggs.

The record reflects that no eyewitness saw what weapon was used. The proof shows that this fact was unknown to the grand jury. Further, from all the evidence in this case, it appears that additional investigation by the grand jury could not have made certain the exact manner or means or the instruments used to inflict death.

We hold that the evidence was sufficient to prove the allegations in the indictment.

■ Finally, complaint is made that the court did not charge on murder without malice. Even if it could be said that the evidence raised such an issue, there was neither an objection for the failure of the court to submit such a charge nor was there a requested instruction. Nothing is presented for review. Counsel recognizes that there are holdings contrary to his contention, but he asks us to change the rule. This we decline to do.

No reversible error is shown. The judgment is affirmed.

MORRISON, Judge (dissenting).

I dissent with all the vigor at my command to the majority opinion.

Cavazos v. State, Tex.Cr.App., 365 S.W. 2d 178 was a unanimous opinion of this

Court, prepared by Judge Belcher. It expressed the sound rule of law in this State. See Robidoux v. State, 116 Tex.Cr.R. 432, 34 S.W.2d 863; Stelman v. State, 123 Tex. Cr.R. 330, 58 S.W.2d 831; Yarbrough v. State, 125 Tex.Cr.R. 304, 67 S.W.2d 612; Otts v. State, 135 Tex.Cr.R. 28, 116 S.W.2d 1084; Walker v. State, 138 Tex.Cr.R. 168, 134 S.W.2d 280; Wooley v. State, 162 Tex. Cr.R. 378, 285 S.W.2d 218; Medina v. State, 164 Tex.Cr.R. 16, 296 S.W.2d 273; Cole v. State, 170 Tex.Cr.R. 264, 340 S.W. 2d 45; McIntire v. State, Tex.Cr.App., 431 S.W.2d 5; Davis v. State, Tex.Cr.App., 474 S.W.2d 466 (dissenting opinion). See also 23 Tex.Jur.2d Evidence, Sec. 116, p. 165; 24 Tex.Jur.2d Evidence, Sec. 678, p. 290; 23 C.J.S. Criminal Law § 842, p. 293.

My brethren now attack these holdings and specifically overrule Cavazos, supra and McIntire, supra, without assigning any valid reason for their departure. If a valid reason exists for such judicial fiat then the bench and the bar should be given that reason.

I dissent.

ODOM, J., joins in this dissent.