**Darrell Wayne STILL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–81–0160–CR.**

Court of Appeals of Texas, Tyler.

Sept. 1, 1983.

Discretionary Review Granted April 11, 1984.

Clifton L. Holmes, Kilgore, for appellant.

William L. Ferguson, County Atty., Henderson, for appellee.

McKAY, Justice.

Upon a plea of not guilty, appellant was found guilty of the offense of murder by a jury, which assessed his punishment at 20 years confinement.

In his first ground of error appellant contends the trial court erred in failing to respond to his timely objection to the

court's failure to charge on the law of circumstantial evidence. However, the Court of Criminal Appeals has recently held in *Hankins v. State,* 646 S.W.2d 191, 197–200 (Tex.Cr.App.1983), that a charge on circumstantial evidence is not only unnecessary but improper where, as here, the court's charge properly instructs the jury on the State's burden of proof, the presumption of innocence and the requirement that an acquittal be entered if there exists a reasonable doubt as to appellant's guilt. Appellant's first ground of error is overruled.

In his second ground of error, appellant asserts the trial court erred in failing to respond to appellant's timely objection to the court's failure to charge on the lesser included offense of criminally negligent homicide. A brief rendition of the facts surrounding the homicide is necessary to bring this ground into proper focus.

Appellant and the deceased, Karen Fay Still, had been married for approximately four months when the shooting took place. On the day of her death, appellant and deceased drove a few miles to the home of appellant's father for a barbecue. During the course of the afternoon, appellant testified he had consumed about a case (24 cans) of beer and one-half pint of whiskey. The deceased had been drinking wine.

Appellant and deceased returned to their mobile home around 6:00 p.m., in the company of some relatives, who departed around 7:30 p.m. Thereafter, appellant remained outside their mobile home for about an hour to feed and attend to their three rabbits, one of which he had given to his wife earlier that day. According to appellant, when he went back into the trailer through the back door by the bathroom, his wife came running toward him, or towards the bathroom. She was evidently ill from drinking too much wine, and she fell in the floor of the bathroom and vomited. Appellant testified he helped her to her feet and told her to change the sheets on their bed while he cleaned up the bathroom. He testified that the sheets were kept on a shelf in the closet above the clothes. He

said he heard her fall and scream, and when he ran into the bedroom he saw she had lost her balance and had fallen in the floor beside the bed, after pulling several clothes hangers off the rack, apparently in an attempt to regain her balance. He testified that she vomited on herself again, and at this point appellant became angry about the mess she was making.

Appellant testified that after he cleaned the bedroom floor, he became increasingly agitated with deceased and began "cussing about the house" as they argued. He said he played with guns all the time, and that he picked up a pistol laying on the bedside table and began waiving it around, gesticulating with it and spinning the cylinder. He said this was a normal occurrence. The pistol here involved was made in such a way that the cylinder could not be spun unless the hammer was cocked back two notches. Appellant testified that as he spun the cylinder in this manner, he observed that there were six bullets, the maximum number, in the pistol.

Appellant testified that at this point he pointed the gun at his wife "like I was shaking my fist at her, you know, but not meaning to hit her, you know, I didn't realize that until it was too late, you know." When asked what next occurred, appellant said:

Well, I said my God what I am I doing and about that time I grabbed for the hammer *and it slipped from under my thumb and it fired* and I threw the gun down, and she was gurgling. I didn't know what to do except to roll her over on her side. I ran and called the Kilgore police, because that's the only number I knew to tell them to hurry to bring the ambulance, and I came back in there and I didn't know what to do. I said God please don't let her die. I washed my hands so I could get a clean pair of her pants. I washed the blood where I had touched her, so I could get a clean pair of pants and put upon her, because I thought I might get her to the hospital someway. I ran back to the phone and told them to please hurry again and

that's when they came to the door, and it is all kind of fuzzy after that. (Emphasis added.)

Appellant further testified that, when he pointed the gun at his wife, he did not intend to shoot her, and did not intend to pull the trigger. When asked to explain exactly what happened, appellant answered:

A. Well sir, I was trying to uncock the gun, and the hammer slipped from under my thumb and hit the firing pin and went off, as farfetched as it may seem, that is true.

Q. Had that ever happened before, had that gun ever fired that way before?

A. Yes. It had.

It is significant to note that appellant, after he perceived the risk involved in pointing the loaded pistol at his wife, continued to point the pistol at her while he attempted to uncock it.

 The trial court charged the jury on murder under § 19.02(a)(1), V.T.C.A. Penal Code, involuntary manslaughter and on appellant's defense that the firing of the pistol was not a voluntary act on his part.[1] As noted above, appellant contends the trial court erred by failing to include, upon proper objection, a charge on criminally negligent homicide. A person commits involuntary manslaughter if he *recklessly* causes the death of an individual. V.T.C.A. Penal Code, § 19.05(a)(1). Section 6.03(c) of the Penal Code defines "recklessly" as follows:

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the cir-

cumstances as viewed from the actor's standpoint.

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. V.T.C.A. Penal Code, § 19.07(a). Section 6.03(d) of the Penal Code defines "criminal negligence" as follows:

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

The difference between the two culpable mental states required to establish the respective offenses lies in whether or not the actor himself perceives the risk of harm which his conduct creates. *Aliff v. State*, 627 S.W.2d 166, 171 (Tex.Cr.App.1982); *Moore v. State*, 574 S.W.2d 122, 123 (Tex. Cr.App.1978). The distinction was explained in *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Cr.App.1975), as follows:

Reckless conduct as defined by V.T. C.A. Penal Code, Section 6.03(c) involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. Criminal negligence as defined by V.T.C.A. Penal Code, Section 6.03(d) involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the result thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.

---

1. Prior to the adoption of the present penal code, this defense was commonly referred to as "accident."

Here appellant testified that he played with guns all the time, and that this particular pistol had fired in the same manner on previous occasions. More to the point, appellant testified that *when he realized what he was doing* he attempted to uncock the gun, but the gun went off in the process. There is nothing in the evidence which indicates appellant was unaware of the risk his conduct created. To the contrary, the evidence from appellant himself shows that he indeed perceived the risk but consciously disregarded it by continuing to point the pistol at his wife while attempting to uncock it. Stated another way, there was no evidence to raise a reasonable doubt that appellant was acting other than intentionally, knowingly, or recklessly, so that the jury could have found that appellant *ought* to have been, *but was not,* aware that his conduct would create a substantial and unjustifiable risk resulting in the death of his wife. *Kuykendall v. State,* 609 S.W.2d 791, 797 (Tex.Cr.App. 1981). Appellant never suggested he failed, at the crucial moment, to perceive the obvious risk involved. Therefore there was no need to submit a charge on criminally negligent homicide and the trial court did not err in failing to do so.

We also observe that the trial court included a charge on appellant's defense that the firing of the pistol was not a voluntary or intentional act on his part, a defense formerly known as accidental homicide. Appellant steadfastly maintained throughout the trial that he did not intend to shoot or kill his wife. In *McKenzie v. State,* 521 S.W.2d 637, 638 (Tex.Cr.App.1975); and *Stiles v. State,* 520 S.W.2d 894, 896 (Tex. Cr.App.1975), the court set out the distinction between criminally negligent homicide and accidental homicide thus:

[1] The difference between accidental homicide and negligent homicide is whether the *act* resulting in death was *intentionally or unintentionally* done. The focus is on the accused's act, not on the result of his act. Accidental homicide is the result of an unintentional act while negligent homicide may only result from an intentional act. This distinction

was recently noted in *Palafox v. State,* 484 S.W.2d 739 (Tex.Cr.App.1972). It was there said:

"As stated in *Egbert v. State,* 76 Tex.Cr.R. 663, 176 S.W. 560, 563 (1915) '... negligent homicide is based wholly upon the theory that the evidence must show that there was no intent to kill by an act *intentionally* done. Accidental homicide arises only when the act which caused the death was *unintentionally* done ...' (emphasis added.)"

And, in *Harris v. State,* 150 Tex.Cr.R. 38, 198 S.W.2d 264 (1946), the difference between an accidental killing and negligent homicide was explained as follows:

'An accidental killing arises when the act which causes the death was unintentionally done ...

'So then, in a broad sense, a distinguishing element between negligent homicide and accidental killing lies in the fact that, in the first, the act which causes death must be intentionally done, while in the other, the act which causes the death was unintentional.' (Emphasis in original.)

Here appellant asserted that he did not intend for the hammer to slip from under his thumb, or for the gun to fire. His entire defense was that firing the pistol was an unintentional act—a tragic accident. We hold appellant's rights were adequately protected by the charges on involuntary manslaughter and involuntary conduct, and that the lesser included offense of criminally negligent homicide was not raised by the evidence. Appellant's second ground is overruled.

In his third ground of error, appellant contends the trial court erred in failing to include appellant's specially requested charge on the State's burden to disprove his allegedly exculpatory statements offered by the State. In his fourth ground, appellant argues the trial court erred in overruling his motion for instructed verdict at the close of all evidence. Because appellant's main argument under ground four is

that since the State failed to disprove his allegedly exculpatory statements he was entitled to an acquittal, we will discuss these two grounds together.

In addition to the evidence discussed under ground two above, the State presented the testimony of three law enforcement officers who responded to appellant's call to the Kilgore Police Department immediately following the shooting. These witnesses reported res gestae statements made to them by appellant such as, "It's my fault, I didn't mean to, I loved her"; "I love my wife, no no no, she is not dead is she?"; and "The gun went off." The State also introduced appellant's written confession in which he stated, "the gun went off."[2] Appellant contends that these statements constitute an admission of guilt plus an exculpatory statement, thus requiring a charge on exculpatory statements under the rule in *Simon v. State,* 488 S.W.2d 439, 443 (Tex.Cr.App.1972).

The rule announced in *Simon v. State, supra,* is that when the State introduces statements which amount to an admission of acts constituting the gravamen of the offense charged plus an assertion that would exculpate the accused from the crime charged, the trial court is required to charge the jury that unless the State disproves the exculpatory statements beyond a reasonable doubt, the accused is entitled to an acquittal. *See Palafox v. State,* 608

S.W.2d 177, 181 (Tex.Cr.App.1980). The opinions in *Palafox* and *Simon* are emphatic, however, in requiring that the statements of the accused *must* amount to an admission of the commission of the offense charged plus an exculpatory statement before the rule is invoked.

Here, the statements of appellant that "I shot my wife" and "Its my fault" are the nearest we can find to admissions of the commission of murder. In our opinion, these do not amount to the type of admissions of guilt required to invoke the rule. Furthermore, the statements "I didn't mean to" and "The gun went off" are the most exculpatory statements in the record.

 We need not decide, however, whether the statements quoted above amount to admissions of the commission of the crime charged plus assertions that would exculpate the accused for the facts of the instant case fall within a well-defined exception to the rule in *Simon* and *Palafox, supra.* In the instant case, appellant took the stand and testified in his own behalf. He told the jury his own version of the killing, stating that he did not intend to shoot his wife and that he did not intend to pull the trigger. His defensive theory was fairly submitted to the jury in the court's charge. Where the accused testifies before the jury in accordance with the exculpatory statements introduced by the State, and his defensive theory is fairly submitted to the

2. Omitting the formal parts, the confession introduced by the State read as follows:

Sunday night me and my wife were in the bedroom getting ready to go to bed. My wife was setting in the setting [sic] in the middle of the bed and I was standing up. I keep a .22 pistol on the night stand by my bed. I picked up the pistol off of the night stand in my right hand and turned around and I was standing in front of the chester [sic] drawers. I checked the cylinder of the pistol to check to see if there were any bullets in the gun. There were six bullets in the gun as I spined [sic] the cylinder I had the hammer back because the gun is a single action and you could not check the cylinder unless up [sic] had the hammer back. As I had the hammer back I turned around and *the gun went off* and hit my wife as she sit on the bed. My wife fell on the bed after she was shot and I put her pants on before I put her pants on I

went to the phone and called the Kilgore Law and told them *that I had shot my wife* Then I layed the phone down I went in the bathroom and washed my hands because they had blood on them and then I went back to the telephone and to the police to send an ambulance out to my house. After the shot I droped [sic] the gun and went to my wife to see how bad she was hurt. When the law got to my house *I told them that I had shot my wife* and I showed them were [sic] my wife was at. One of the officers told me to sit down and it will be allright [sic] and that the amublance was on its way. I thing [sic] that I told the officer *that I shot her with the silver gun.* ME and my wife had been out early in the night drinking I was drinking beer and my wife was drinking Mogan David wine. We had been out driving around and we went to my fathers house before we came home. (Emphasis added.)

jury, the general rule as to exculpatory statements is rendered inapplicable. *Jeffcoat v. State*, 644 S.W.2d 719, 723–4 (Tex.Cr.App.1983); *Bruce v. State*, 402 S.W.2d 919, 921 (Tex.Cr.App.1966); *Vaughns v. State*, 172 Tex.Cr.R. 465, 358 S.W.2d 133, 134 (1962). Appellant's third ground of error is overruled.

■ For the same reason that a charge to the jury on exculpatory statements was not required, neither was an instructed verdict of acquittal required under these facts. As stated above, the State was not bound to disprove appellant's "exculpatory" statements beyond a reasonable doubt. The evidence is undisputed that appellant shot and killed his wife. Although appellant maintains the killing was accidental, the fact remains that he pointed a loaded pistol at his wife and that pistol discharged a bullet which caused her death. A pistol is a deadly weapon per se, and when used by a defendant an intent to kill is presumed. *Jeffcoat v. State, supra* at 725; *Williams v. State*, 567 S.W.2d 507, 509 (Tex.Cr.App. 1978); *Jackson v. State*, 548 S.W.2d 685, 696 (Tex.Cr.App.1977).

■ The State introduced evidence of bruises on deceased's body, scratches on appellant's arms, shoulder and back, and the general disarray of the bedroom, in contrast to the neatness of the rest of the mobile home, indicating that a struggle or fight had occurred. The State also produced evidence that appellant had a violent temper and had been physically and verbally abusive of his wife on prior occasions. In light of the entire record presented, we hold the evidence was sufficient to overcome appellant's motion for instructed verdict. Ground four is overruled.

■ Finally, appellant contends the trial court erred in failing to instruct the jury, over appellant's objection, that temporary insanity induced by voluntary intoxication could be considered by them in mitigation of punishment at that phase of the trial. V.T.C.A. Penal Code, § 8.04, "Intoxication," provides in part:

(b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

(c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

(d) For purposes of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

In *Hart v. State*, 537 S.W.2d 21, 24 (Tex.Cr.App.1976), the court held that "a defendant, to avail himself of the mitigation provision of Section 8.04, *supra*, must, as a result of intoxication, (1) 'not know his conduct was wrong' or (2) '[be] incapable of conforming his conduct to the requirements of the law he violated.'" In that case it was held that testimony that defendant didn't know what he was doing when intoxicated and that he could not remember what happened on the night of the offense was insufficient to raise the defense.

In the instant case, although it is undisputed that appellant had consumed an inordinate amount of intoxicating beverages, there is no contention that he did not know his conduct was wrong or that he was incapable of conforming his conduct to the requirements of the law he violated. Indeed from the evidence outlined under grounds two through four above, it appears that appellant fully appreciated the nature of his conduct. Although he testified he "got mad" and "lost his head," his own statement that he tried to uncock the gun shows that he knew his actions were wrong, and is inconsistent with temporary insanity. His description of the killing and of the events leading up to it was clear and concise, although it appears he became dazed and confused after the officers arrived, a condition consistent with the shock that normally follows a traumatic experience.

We hold the evidence did not raise the issue of temporary insanity caused by voluntary intoxication, and thus the trial court's failure to charge the jury thereon, in mitigation of punishment, was not error. Appellant's fifth ground of error is overruled.

We are aware that, under the evidence presented above, a conviction for murder seems rather harsh. However, the jury had before it all the aforementioned evidence and was properly charged on every defensive theory raised by the evidence. The jury, as the trier of the facts, could have accepted appellant's testimony that the killing was either accidental or reckless. However, it chose not to do so. It is not the function of this court to substitute its judgment for that of the jury where the evidence is in such conflict, and we decline to do so here. Although it may seem that appellant was guilty chiefly of stupidity, such stupidity resulted in the death of an individual. Under the record as a whole, a reasonable jury would have been warranted in finding appellant guilty of murder as charged in the indictment.

The judgment of the trial court is affirmed.

COLLEY, J., not participating.