KING REED V. THE STATE.

No. 14195. Delivered November 14, 1931.
tate's Rehearing Denied February 17, 1932.

The opinion states the case.

*W. A. Wright,* of San Angelo, *J. A. Johnson,* of Stephenville, and *S. H. Millwee,* of Colorado, Texas, for appellant:

On his contention that he was entitled to an instructed verdict. *(Code of Criminal Procedure* (1925), *Art. 848; Mitchell v. State,* 33 Texas Crim. Rep., 575; *Freeman v. State,* 216 S. W., 878; *Jolly v. State,* 87 Texas Crim. Rep., 288, 221 S. W., 279; *Green v. State,* 260 S. W., 195; *Pierson v. State,* 93 Texas Crim. Rep., 242; *McCollum v. State,* 93 Texas Crim. Rep., 235; *Rochetsky v. State,* 251 S. W., 232; *Walker v. Commonwealth* (Ky.), 76 S. W., 359; *Walker v. State,* 14 Texas App., 610. See especially page 630 of this case for the rules that should govern).

On the proposition predicated upon the fact that the state introduced a confession by appellant containing exculpatory statements which were not disapproved. *(Pharr v. State,* 7 Texas App., 472; *Pratt v. State,* 50 Texas Crim. Rep., 227; *Banks v. State,* 56 Texas Crim. Rep., 263; *Mullins v. State,* 225 S. W., 164; *Combs v. State,* 52 Texas Crim. Rep., 614, 108 S. W., 649; *Forrester v. State,* 248 S. W., 40).

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State:

On the state's contention that in a murder case a prima facie case is established when it is shown that the deceased is dead and that he came to his death by reason of the criminal act or agency of the accused. *(Article 1204, P. C.; Davis v. State,* 209 S. W., 749; and *Howard v. State,* 13 S. W. (2d) 80).

The state contended that the statement contained in the confession, introduced in evidence, to the effect that "he (appellant) had to do it", was not an exculpatory statement within the purview of the statute.

CALHOUN, JUDGE.—Murder is the offense; the punishment, three years in the penitentiary.

The state introduced as a witness W. T. Blakeway, who testified that he had been a member of the police force in the town of Midland and was serving as such on or about the 21st day of July, 1929; that he was on duty the Saturday night on or about that date; that he knew Holcombe at the time, and at the time said Holcombe was killed, he was a night watchman employed by the merchants of the town; that about 2

o'clock at night, he heard some four or five shots, he couldn't say just exactly how many; that he started towards the shots and he heard someone groaning and found the deceased in the street; that said Holcombe was the only one there at the time he got there. When he first heard him, he made no statement to him and was lying on the ground on his back. He further testified that he found a pistol, about twelve feet from the foot of the deceased, lying in the street.

Dr. W. S. Ryan testified for the state that he was a practicing physician in the town of Midland. He was called to the hospital and that he saw appellant, King Reed, at the hospital; that he was already in the hospital when he got there and he helped to attend to him; that he was wounded. He noticed that defendant, King Reed, had been drinking and smelled liquor on his breath and found the defendant was a seriously injured man; that he was in a good deal of pain and that he vomited once or twice; that he thought he was intoxicated at the time; that he helped Dr. Thomas operate on the appellant, Dr. Thomas did the cutting. There was about six entrails of appellant perforated by bullets and about six holes in his intestines, one of them was shot clear in two, and one was nearly in two; they cut it in two and sewed it back.

The state offered the testimony of A. C. Francis, sheriff of Midland County, Texas, who testified that he was sheriff and tax collector and was serving in that office on the 21st day of July, 1929, when the shooting occurred, and knew the appellant, King Reed, who, at the time of the shooting, was chief of police in the city of Midland. That a man by the name of Chilton was the first man who phoned him. That he got up and went down to where deceased was down at the Frye Rubber Co. There were three or four there at the time he got there; that Mr. Blakeway gave him a pistol which contained two empty and three loaded shells in the pistol. The deceased was practically dead when he arrived, he never did speak. That he did not see the defendant, Reed, that night in the hospital, but that he came in possession of his gun that night; that he got it out at the hospital. There was four empty and one loaded shells in the gun. The sheriff further testified that he next day about 1 o'clock he had a conversation at the hospital with appellant, when he, the district attorney, and Dr. Thomas were present; that they went up to see how the defendant was and if he had anything to say; that when he went in he said: "Chief, this is the district attorney, Mr. Smith, you don't know him". He said, "Yes", and I said, "I thought we would come up and see if you had anything to say, or what it was all about". He said, "Well, I am sorry, I had to do it, it is mighty bad". And I said, "Well, what is it about, Chief?" He said, "Well, I have got no statement to make", but he said, "He was messing with my business; I am sorroy I had to do it". He also testified on cross-examination that defendant did not tell him that was the reason he shot him.

As to the conversation between the defendant and sheriff, the district attorney, W. R. Smith, offered by the state, testified substantially as did the sheriff as to what occurred.

The state offered one or two other witnesses as to the fact that defendant was drinking on the night of the homicide. The state also proved by several witnesses that they had heard appellant make statements derogatory to deceased.

The appellant offered in evidence a number of witnesses who testified to his good reputation for a peaceable, law-abiding citizen; also Dr. John B. Thomas, who was at the hospital at the time he was operated on, testified as to his being sober and not under the influence of liquor at that time.

The defendant, King Reed, testified in his own behalf and stated that on the night of the killing, he, together with one Chilton, drove around town to see that everything was quiet; that he woke up two boys who were in a car asleep and made them go home; that he followed them in his car to see that they did get home and saw them drive up to their home and get out; that he then turned and came back to town; that he then saw the light of a car and told Chilton to follow it and see who was out at that time of night, and they followed the car but did not know who was in the car and had no suspicion who it was and that his only purpose in following the car was that he felt it his duty as an officer to see who it was out at that time of the night. After they had followed the car, it turned and went into the Frye Rubber Co. Chilton drove his car on up and the other car drove back and under the shed. They stopped their car and he got out of his car, and Holcombe got out of his car, which was the one they had been following and belonged to the Frye Rubber Co. When he got out of the car, he asked who it was, and asked Holcombe if that was he. That he told Holcombe, "I didn't know who was driving the car"; that the deceased then told him he understood he was going to kill his dog; that he told him he did not have any right to kill his dog and did not want to. That there had been a number of mad dogs reported and he had killed two or three dogs. Holcombe then told him that if he knew what the people of Midland thought of him, he would leave the town before had to leave, and he said, "We won't argue that". That Holcombe reached for his gun and defendant raised his hand and commanded him to "Back up". He did not remember the distance he was from him, but he backed up close to his car and said to Holcombe, "If that is the way you feel about it, don't wear your gun back on the street any more. If you do, I will have to take it off of you". Then deceased started to shoot. That he was standing by his car when deceased shot and he had his hand on the fender and the first shot went through his right hand and clipped the hood. That when the deceased began shooting, he turned and tried to get out of the way and as he turned

around, the deceased shot him in the abdomen. He had his pistol hanging from his scabbard and he got his gun as quickly as he could; that he didn't remember how many times he shot but shot as fast as he could shoot. That he did not know how many times he hit Holcombe, but when Holcombe commenced to stagger, he quit shooting. That Holcombe then staggered out in the street and fell facing east. That he called to the deceased and asked him if he was hurt; he did not answer, and then he turned to Chilton and asked him to please get him to Dr. Thomas' hospital as quickly as he could because he was shot in the stomch. That Chilton carried him to the hospital and on the way to the hospital he took a drink from a prescription bottle he had, and as to how he came to take a drink, he was sick from the loss of blood and would have taken anything that would give him relief.

The defendant's testimony was corroborated substantially as to what happened at the time of the shooting, and as to the deceased having shot twice at appellant before appellant drew his pistol and shot him, by the witness Chilton, who, so far as the record shows, was the only witness and the only person present at the time of the shooting, besides the appellant and deceased.

The appellant, by bill of exception, complains of the refusal of the trial court, at the time the state closed its case, to grant his motion for an instructed verdict on account of the insufficiency of the evidence, and also makes the contention that the evidence was not sufficient as a matter of law to support the conviction.

The record shows that to connect the appellant with the killing, the state introduced the testimony of the sheriff, A. C. Francis, and the district attorney, W. R. Smith, as to the statement made to them by the appellant, and by the confession of the appellant proved that he was the person who killed the deceased, and in connection therewith the statement of the appellant to the following effect: "I am sorry. I had to do it. It is mighty bad. He was messing with my business. I am sorry but I had to do it."

The state having introduced the statement, it cannot ignore this latter exculpatory or mitigating fact and could dispose of it only by proof of its falsity. The statement put in evidence by the state, tended, if true, to exonerate appellant, and the further facts in evidence do not disprove the statement of the appellant and his witness Chilton that the appellant acted in self-defense.

In the case of Banks v. State, 56 Texas Crim. Rep., 262, 119 S. W., 847, Judge Davidson stated the rule to be: "Where the state puts in evidence the statements of the accused party, which exculpates the accused and does not directly or indirectly disprove them, the accused is entitled to an acquittal."

In the case of Huffman v. State, 97 Texas Crim. Rep., 436, 262

S. W., 76, 77, Judge Lattimore, speaking for the court, said: "When the state has placed in evidence a confession or statement of the accused which is exculpatory, the state is bound thereby unless the other testimony demonstrates the falsity of such statement." Citing Pharr v. State, 7 Texas App., 472; Combs v. State, 52 Texas Crim. Rep., 617, 108 S. W., 649; Pratt v. State, 53 Texas Crim. Rep., 281, 109 S. W., 138; Bryan v. State, 54 Texas Crim. Rep., 62, 111 S. W., 1035; Banks v. State, 56 Texas Crim. Rep., 262, 119 S. W., 847; Winkler v. State, 58 Texas Crim. Rep., 564, 126 S. W., 1134; Sanchez v. State, 67 Texas Crim. Rep., 453, 149 S. W., 124; Menefee v. State, 67 Texas Crim. Rep., 201, 149 S. W., 138, 141; DeLeon v. State, 68 Texas Crim. Rep., 625, 155 S. W., 248; Forrester v. State, 93 Texas Crim. Rep., 415, 248 S. W., 40; Mullins v. State, 88 Texas Crim. Rep., 130, 225 S. W., 164.

We have carefully examined the testimony for the state to determine whether there be other testimony showing the exculpatory statement of appellant, placed in evidence by the state, to be false, but are unable to arrive at that conclusion. Under the facts, the court erred in allowing the conviction to stand, and the motion for new trial should have been granted.

By bill of exception, appellant also complains of certain argument of the district attorney in his closing speech to the jury. We do not deem it necessary to discuss these bills owing to the disposition we are making of the case.

For the error discussed, the judgment will be reversed and the cause remanded.

Reversed and remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON STATE'S MOTION FOR REHEARING.

HAWKINS, JUDGE.—The state predicates its motion on the proposition that our original opinion is too broad in characterizing the statement made by appellant at the sanitarium and proven by the state, as set out in our original opinion, as an "exculpatory statement of fact." It is insisted that he language attributed to appellant is ambiguous, embraces a conclusion, and furnishes no tangible claim that the state could combat.

No instruction was given to the effect that the state was bound by such statement, and that the burden rested on the state to disprove that the transaction took place as explained by appellant, neither was there a requested charge upon the subject. If the question of the propriety of such an instruction was before us the state's contention would be most persuasive because of the ambiguity of the language attributed to appel-

lant at the sanitarium. Our original opinion was dealing with appellant's contention that the evidence was not sufficient as a matter of law to support the conviction. From that standpoint the language in question must be considered in connection with the evidence given upon the trial as to how the difficulty arose, and appellant's relation to it. The state had practically no evidence of a satisfactory nature explanatory of appellant's statement made to parties at the sanitarium. The evidence of appellant and the man who was with him at the time of the killing made clear that when appellant said, "I had to do it," he meant to convey the information that he was acting in self-defense. The other ambiguous phrase, "We was messing with my business,"—or, as some witnesses put it, "meddling with my business,"—was explained upon the theory that the appellant, as chief of police, was charged with the duty of enforcing the ordinances of the city, one of which prohibited the parking of cars on the streets at night. Appellant complained that deceased—who held no commission at an officer, but who was employed by the merchants as a night watchman—had been authorizing such night parking. When considered in connection with the positive testimony of appellant and the only other eyewitness as to how the killing came about, the expression last referred to loses its significance as a circumstance against appellant.

We think the original disposition of the case was correct. With the language of our original opinion modified as indicated herein, the state's motion for rehearing will be overruled.

*Overruled.*