Kenneth Julian **PALAFOX**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 53611.

Court of Criminal Appeals of Texas, En Banc.

Jan. 24, 1979.

Rehearing Denied Dec. 10, 1980.

Tom P. Senff, Nacogdoches, for appellant.

David D. Adams, Dist. Atty., Nacogdoches, for the State.

Before the court en banc.

OPINION

ROBERTS, Judge.

This is an appeal from a conviction for capital murder; more specifically, appellant was charged with murder in the course of a robbery pursuant to the provisions of V.T.C.A., Penal Code, Section 19.03(a)(2).[1] Punishment was assessed at death. See Art. 37.071, V.A.C.C.P.

Appellant's third ground of error is that the evidence is insufficient to support the jury verdict finding appellant guilty of capital murder. We uphold this contention and reverse.

As noted above, appellant was alleged to have committed the offense in the course of

---

1. Section 19.03(a)(2) reads as follows:

"(a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and:

&ast; &ast; &ast; &ast; &ast; &ast;

(2) the person intentionally commits the murder in the course of committing or at-tempting to commit kidnapping, burglary, robbery, aggravated rape, or arson;

&ast; &ast; &ast; &ast; &ast; &ast;

"(b) An offense under this section is a capital felony."

committing and attempting to commit robbery. The indictment charged that appellant on or about September 6, 1975, in Nacogdoches County

"... did then and there, knowingly and intentionally, cause the death of Paul Box, hereafter called deceased, by shooting him with a pistol, and that said Kenneth Julian Palafox, was then and there in the course of committing and attempting to commit a robbery ..."

In this case the State relied for conviction on the appellant's confession, as well as circumstantial evidence which tended to support the confession. Omitting the warnings and formal parts, appellant's confession reads as follows:

"My name is Kenneth Palafox and I am 28 years of age; I was born in Brownsville, Texas, and at present I consider the following address my home 1402 East Starr Avenue, Nacogdoches, Texas 75961.

"Michael Molandes and I were together earlier on the evening of September 6, 1975, at my apartment, which is the manager's apartment at Hillcrest Apartments in Nacogdoches, Texas. Michael wanted to go out into the country someplace and shoot some guns, so we got in my car, a 1970 model Cougar, and drove to Melrose. I thought my ex–father–in–law, Paul D. Box, might let us do some shooting on his place, so I turned down the lane which led to his house and parked in front of the house. We both went up on the porch and knocked on the door and Mr. Box came to the door. I asked him if we could go shooting in the pasture this late at night, since it was about 10:00 P.M., and he said no. I think he was a little upset at our coming out that late. We both turned around and started to walk off and Mike Molandes said, 'He's got a rifle'. I guess it wasn't self–defense because we could have kept on walking, I guess, But I turned around and started towards Mr. Box. When I was about five or six feet away from Box, I jumped up in the air, turned sideways and kicked the rifle out of his hand. Then I pulled my pistol out and shoved him in the doorway into the house. I then began poking at him and telling him I didn't like for people to point guns at me and also told him some other stuff which I can't remember. I made him go into the bedroom which contained the bed which had not been slept in and the bed was made up. Mike Molandes was following me behind and was carrying a Ruger .22 calibre rifle with a rotary clip in it. I told Mike to watch him while I found something to tie him up with. I found some ties. Mike had the gun on him while I was looking. When I returned with the ties, Mr. Box was lying face–up on his back and I tied his feet with the ties just like I was tying up a Gook. Then I told him to turn over and I tied his hands behind his back. I walked to the other side of the bed. He knew I was going to shoot him. I pointed my Ruger magazine–fed .22 calibre pistol at his head and shot him about six times. Michael Molandes was standing there with me when I did it. We were leaving the house, when Michael Molandes said that we ought to try to make it look like a burglary, so we kind of messed up the house by opening a dresser drawer, rummaging through things and so forth. Michael Molandes went out to the car an got and old Afro–comb which had been in there for a long time and we dropped it by a baby bed and a set of chest of drawers in one of the bedrooms. Mr. Box only had $5.00 in his billfold, and I took it and placed it in the bedroom where it looked like Mr. Box had been sleeping. Then we took a portable color television set, RCA XL 100 21–inch screen, a flashlight, some 30.06 ammunition and a 12 guage automatic shotgun, a rifle cleaning kit, and high–powered rifle with a scope (a 1903–A3 Springfield 30.06 calibre) and an 8–track stereo with AM and FM radio. We didn't particularly want any of this stuff, but we wanted it to look like a burglary. As we were leaving the house, I looked at the clock and it was five minutes until eleven (10:55 P.M.) We left and drove back to Nacogdoches and went to Patsy Turner's apartment No.

8-A at Hillcrest Apartments at 1013 Douglass Road, Nacogdoches, Texas. Patsy was in bed when we arrived and I opened her apartment door with my master key. We put all the items taken from Mr. Box's house in the apartment of Patsy Turner, including the Ruger rifle and the Ruger pistol. Then we went to an apartment in the Villa apartments where a big blond fellow named Bulldog lives and smoked pot and drank a lot until about 3:30 or 4:00 A.M. There were about 7 or 8 people there, all males, including us. We then went home and I woke up at 11:00 A.M. the next morning."

In addition to the confession, the State presented testimony from several witnesses, including Reba Box, widow of the deceased, who testified that on September 6, 1975, she was away from her home in Melrose, visiting relatives in Houston. She testified that she called her home at 9:00 p. m. and 10:11 p. m. that evening and spoke with her husband. She testified that at that time everything seemed in order. She stated that she learned of her husband's death in the early afternoon of the next day and then returned home immediately. She stated that personal property, including two guns, a television set, and a stereo, was missing from the house. Many items of property were out of place and some drawers were opened. Empty cartridges and the deceased's billfold were found in the bedroom.

Mrs. Box testified that appellant was her ex-son-in-law. In October of 1973, he had married Carol, her daughter. They were divorced prior to October of 1974. She stated that she and the deceased did not approve of the marriage and had discouraged it. She described one incident in which the deceased and appellant had "exchanged words" after her daughter and appellant separated. She also described appellant's attempted suicide during the marriage and his subsequent hospitalizations prior to the divorce.

Dr. Charles Dale, a pathologist, testified that he conducted an autopsy of the deceased. He testified that the cause of death was multiple bullet wounds to the head. He testified that these wounds were caused by at least four separate shots, and stated that he recovered four flattened lead bullets and a few small fragments from the deceased's head. He further testified that the bullets were fired from "pretty close" range.

C. R. Box, brother of the deceased, testified that he discovered the body of the deceased at about 1:00 p. m. on September 7th. He stated that the deceased was lying on his stomach, with his hands and feet tied behind him with neckties. The telephone receiver was off the holder and on the floor.

C. B. Copeland, deputy sheriff, testified that he arrived at the scene of the murder after the body was found. He testified that he found seven .22 caliber hull shells in the room where the body of deceased was found. He also testified that there appeared to have been a struggle in the living room. He further testified that on September 10th most of the missing property was recovered pursuant to a search of an apartment occupied by Patsy Turner.

Patricia (Patsy) Turner testified that on the night of the murder, she was living at the Hillcrest apartments. That night, after she was in bed, appellant and Mike Molandes came into her apartment with a key which appellant had. She stated that she did not get out of bed, but that the two men made two to three trips, carrying some things into the apartment. She testified that appellant told her that he had gotten the things from his mother's attic.

The State introduced much other evidence to show that appellant had been in possession of the items missing from the Box residence. There was extensive testimony from various witnesses regarding whether or not the bullets fired in the home of the deceased were fired from a pistol belonging to appellant, which Turner found in her apartment. Joe Urbanovsky, a chemist for the Department of Public Safety, testified that an afro-comb, found at the scene of the crime, contained human hair of Negro origin. A cigarette butt, also found at the scene of the murder, was found to contain marihuana.

Calvin Story, a firearms examiner with the Department of Public Safety, testified that bullet fragments recovered from the head of the deceased, as well as seven fired cartridge cases, were submitted to him for analysis. He stated that in his opinion the seven cartridge cases were fired from the appellant's pistol, but that he could not state positively that the fragments had also been fired from the same gun. He stated that the fragments could have been fired from the pistol, but that due to the mutilated condition of the fragments, he was unable to make a positive determination.

Danny Stilley, a witness called by the State, testified that for five years he had been an acquaintance of appellant. He testified that once, shortly after appellant's divorce, appellant had stated that he was going to "get Mr. Box back for what he had done."

Stilley also testified that on the night of the murder he saw appellant twice. Stilley and others were at a party in an apartment. On the first occasion that Stilley saw him, appellant arrived at the party with Mike Molandes and Molandes's brother. Stilley testified that after a period of time appellant left, but he returned some time later, at approximately 11:30 p. m. or 12:00 a. m. At this time, according to Stilley he had a conversation with appellant, during which appellant asked Stilley "if [he] knew where anything [was] that [appellant] could steal and make some money." Stilley testified that he tried to drop the conversation, but that appellant pursued the matter a little. He stated that later during this conversation "[appellant] said that he had blown Mr. Box's shit away."

Sam Pelequin also testified that he attended the party on the night of the deceased's death. He stated that he saw ap-

pellant on two separate occasions. Pelequin testified that the first time he saw appellant, "appellant was talking about killing Mr. Box." He stated "[appellant] said he was going to blow [Mr. Box's] shit away." Pelequin testified that appellant left the party but returned. During a conversation with appellant after his return to the party, "[appellant] said that he had blowed [Mr. Box's] shit away," according to Pelequin's testimony.[2]

■■■ It is well stated that "[w]here the state puts in evidence the statements of the accused party which exculpates the accused, and does not directly or indirectly disprove them, the accused is entitled to an acquittal." *Banks v. State*, 56 Tex.Cr.R. 262, 265, 119 S.W. 847, 848 (1909). The rule was stated in somewhat different language in *Huffman v. State*, 97 Tex.Cr.R. 436, 438, 262 S.W. 76, 77 (1924): "[w]hen the State has placed in evidence a confession or statement of the accused which is exculpatory, the state is bound thereby unless the other testimony demonstrates the falsity of such statement."[3] Of course, it is necessary that the confession or statement amount to an admission plus an assertion that would exculpate the accused from the crime charged. *Davis v. State*, 474 S.W.2d 466 (Tex.Cr.App. 1971); *Brown v. State*, 475 S.W.2d 938 (Tex. Cr.App.1971); *Simon v. State*, 488 S.W.2d 439 (Tex.Cr.App.1972).

To invoke the rule, therefore, it must first be established that the accused has admitted doing the acts which would ordinarily constitute the gravamen of the offense.[4] Then, this Court must determine whether the statements alleged to be exculpatory are such as would clear or tend to clear the accused from fault or guilt. *Davis v. State*, supra at 467–468; *Brown v. State*,

---

2. The appellant did not testify. Cf. *Glover v. State*, 566 S.W.2d 636, 637 (Tex.Cr.App.1978).

3. Both *Banks* and *Huffman* were quoted with approval, and followed, in *Reed v. State*, 119 Tex.Cr.R. 459, 463–464, 46 S.W.2d 319, 321 (1931) and *Medina v. State*, 164 Tex.Cr.R. 16, 17–18, 296 S.W.2d 273, 274 (1956). And see *Richards v. State*, 511 S.W.2d 5 (Tex.Cr.App. 1974).

4. Thus, where the accused makes no admission of guilt, and his statement is entirely exculpatory, the rule may not be invoked. *Trevenio v. State*, 48 Tex.Cr.R. 207, 209, 87 S.W. 1162, 1163 (1905); *Dixon v. State*, 128 Tex.Cr.R. 584, 588, 83 S.W.2d 328, 330 (1935).

supra at 955; *Richards v. State,* supra (note 3) at 6–7. Finally, it must appear that the State has not refuted the exculpatory statement. *Medina v. State,* supra (note 3) at 274–275. And see *Glover v. State,* supra (note 2).

In the case before us, the appellant admitted in his confession that he killed Paul Box and that he took the items stolen from Box's home. He therefore satisfied the first requirement of the rule by admitting acts which would normally constitute the offense alleged in the indictment.

However, appellant did not at any point in his confession state or even imply that the murder was committed in the course of a robbery, as alleged in the indictment. In fact, he clearly stated that the murder was done for its own sake. Then, according to the confession, appellant's companion urged that they try to make it *appear* that the murder was part of a *burglary*; it was only for this reason, according to appellant's confession, that the items were taken.

■■■ These statements are exculpatory, since they show that appellant was not guilty of the offense charged in the indictment. The statements may be sufficient to show that appellant was guilty of the lesser included offense [5] of murder, as defined by Section 19.02 of the Penal Code, but they are clearly not sufficient to show that appellant was guilty of murder in the course of a robbery, the offense charged. For this reason the statements tend to clear the appellant of guilt and must be considered exculpatory.[6]

5. See Art. 37.09, Vernon's Ann.C.C.P.

6. It seems elementary that where the State proves the commission of an offense other than the offense charged, the State's evidence is exculpatory to the offense charged, and the accused is entitled to an acquittal. In fact, this is the general rule. *Martinus v. State,* 47 Tex. Cr.R. 528, 84 S.W. 831 (1905); *Converse v. State,* 141 Tex.Cr.R. 273, 148 S.W.2d 424 (1941); *Jones v. State,* 532 S.W.2d 596 (Tex.Cr. App.1976).

Yet where the offense proved is a lesser included offense of the offense charged, the accused is entitled to an acquittal of the greater offense but may be found guilty of the lesser offense. *Jones v. State,* supra. In such a case, however, the evidence is still exculpatory, at

■ The remaining question is whether the State has refuted the exculpatory statements in appellant's confession. Since the statements exculpate appellant as to an element of the offense, they must be disproved beyond a reasonable doubt. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). We do not believe the State has met this burden.

An examination of the non–confessional evidence reveals that the State relied on two facts to show that the murder was committed in the course of a robbery. The first of these was the murder itself, and the second was the taking of the property from the home of the deceased.[7]

■ However, these facts do not disprove the exculpatory statements in appellant's confession, since they do not show beyond a reasonable doubt that the murder was committed in the course of a robbery rather than as described in the confession. At most, the State's non–confessional evidence makes it *"as likely as not"* that the murder was in the course of a robbery. *Mullaney v. Wilbur,* supra at 703, 95 S.Ct. 1881 (emphasis in original). This evidence just as readily supports the version of the murder set out in the confession.

Due process requires more than this, especially in a death penalty case. *Mullaney v. Wilbur,* supra; *Chambers v. State,* 568 S.W.2d 313, 329–330 (Tex.Cr.App.1978) (dissenting opinion). We therefore hold that the State has failed to meet its burden of proof. As the majority in *Mullaney* said:

least to the extent that it frees the accused of the burden of the higher punishment attached to the greater offense. See *Jones v. State,* supra.

Applying these general rules to the case before us, we see that insofar as the statements in the confession showed that the appellant was guilty only of the lesser included offense of murder, the statements were exculpatory because they allowed appellant to avoid the death penalty, which was the maximum punishment attached to the offense charged (and which was not a possible punishment for the lesser offense). *Jones v. State,* supra.

7. See V.T.C.A., Penal Code, Sec. 29.02 (Robbery).

"No doubt this is often a heavy burden for the prosecution to satisfy. The same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial. But this is the traditional burden which our system of criminal justice deems essential." *Mullaney v. Wilbur*, supra at 701, 95 S.Ct. at 1891.

Had the State not introduced and thereby become bound by appellant's exculpatory statements, our review of the sufficiency of the evidence might lead us to another conclusion. However, on the basis of the evidence before this Court, the record reflects: 1) very hostile feelings by appellant towards the deceased; 2) threats by appellant to kill the deceased; 3) overwhelming evidence that appellant did kill the deceased; 4) overwhelming evidence that appellant took property from the home of the deceased; and, 5) evidence presented by the State that appellant formed the intent to take the property *after* the murder and did so only to make it *appear* that the premises had been burglarized.

Thus, we hold that the State, being bound by the exculpatory evidence, did not introduce sufficient other evidence to rebut the evidence that appellant did not kill the deceased while in the course of committing robbery. Therefore, we hold that the evidence is insufficient to support the conviction for capital murder.

Accordingly, the judgment is reversed and the cause remanded.

### DOUGLAS, Judge, dissenting.

Assuming that statements in the confession were exculpatory, Judge Dally's dissenting opinion is correct, but his footnote 1, which states that the State should not be allowed to introduce only a part of a defendant's statement, is too broad. Parts of a defendant's statement or confession may be inadmissible and should not be admitted. We still have the rule adopted by the Legislature that would prevent a distorted version by the introduction of a part of a confession by the State. Article 38.24, V.A. C.C.P., Part of an act, declaration, conversation or writing, provides:

"When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given...."

The judgment should be affirmed.

### DALLY, Judge, dissenting.

It is a well established rule that when the State introduces a defendant's confession in evidence, it is bound by any exculpatory statements contained therein unless such statements are disproved. See cases cited in 12A Texas Digest, Criminal Law, ☜781(8). See also McCormick and Ray, Evidence, Sec. 1224 (2d ed.1956); 1 Branch's Penal Code, Sec. 95 (2d ed.1956). However, this rule is not a sound rule; it should no longer be followed.[1]

That the State is bound by exculpatory statements contained in the confession which it offers in evidence rests on a rule that, by introducing the confession into evidence, the State vouches for its credibility. Thus, the rule exists as a variant of the broader "voucher" rule, which is itself a rationalization for the rule against impeaching one's own witness. 3A Wigmore, Evidence, Sec. 898 (Chadbourn rev.1970); McCormick, Evidence, Sec. 38 (2d ed.1972). Not only does it strain credulity to suggest that the State guarantees the credibility of a criminal defendant, but such a guarantee is wholly inconsistent with the right of the State to introduce facts contrary to the exculpatory statements. If there were such a guarantee, the State could not fly in the face of it proving that the exculpatory statements are not to be believed.

The voucher rule has been widely condemned as archaic, irrational, and destruc-

---

1. A corollary equally well established, which should also be abandoned, is the rule that the State may offer in evidence only portions of a defendant's statements; the result of this rule is that a confession offered by the State is often wholly distorted.

tive of the truth–gathering process. 3A Wigmore, supra; McCormick, supra; Morgan and Weinstein, Basic Problems of State and Federal Evidence, p. 63 (5th ed.1976). The United States Supreme Court has stated that the rule "bears little present relationship to the realities of the criminal process," and has held that its application in some situations may interfere with a defendant's right to confront and cross–examine witnesses and to call witnesses in his own behalf. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The "voucher" rule has been rejected in Rule 607 of the Federal Rules of Evidence, and its application has been limited in Texas. Art. 38.28, V.A.C.C.P.

In order for the "exculpatory statements" rule to be applicable, the statement of the accused must constitute an admission plus an assertion that would exculpate the accused from the crime charged. *Simon v. State,* 488 S.W.2d 439 (Tex.Cr.App.1972); *Brown v. State,* 475 S.W.2d 938 (Tex.Cr. App.1971). That is, if the accused does not admit doing the acts which constitute the gravamen of the offense, the State will not be bound by his statement even though the facts asserted therein are inconsistent with a finding of guilt. *Simon v. State,* supra; *Brown v. State,* supra; *Davis v. State,* 474 S.W.2d 466 (Tex.Cr.App.1971). The rule as to exculpatory statements also has no application where the defendant testifies to substantially the same facts as contained in his exculpatory statement and the trial court submits this defense to the jury. *Bruce v. State,* 402 S.W.2d 919 (Tex.Cr.App.1966); *Vaughns v. State,* 172 Tex.Cr.R. 465, 358 S.W.2d 133 (1962); *Madden v. State,* 171 Tex.Cr.R. 80, 344 S.W.2d 690 (1961). These attempts to modify or qualify the rule serve only to demonstrate its irrationality.

Truth is not obtained by binding parties with guarantees and vouchings. The State should not be bound by, and the trier of fact should not be required to accept as true, the exculpatory statements of a defendant, no matter how incorrect or far-fetched they might be, merely because the statements were introduced by the State and not disproved by other evidence. See

*United States v. Norman,* 518 F.2d 1176 (4th Cir. 1975). *Exculpatory statements should be weighed and considered by the trier of fact, and should be accepted or rejected by the trier of fact, in the same manner as is the other evidence in the case.*

I dissent.

TOM G. DAVIS, Judge, joins in this dissent.