**Darryl Gene BOUDREAUX, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–87–01086–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 1988.

Discretionary Review Refused
Nov. 30, 1988.

---

Henry Burkholder, III, Houston, for appellant.

John B. Holmes, Dist. Atty., Harris County, Lynne Parsons, Asst. Dist. Atty., for appellee.

Before EVANS, C.J., and SAM BASS and DUNN, JJ.

## OPINION

SAM BASS, Justice.

Appellant was indicted for burglary of a habitation, enhanced by two prior felony theft convictions. After being found guilty by a jury of burglary, appellant elected to have punishment assessed by the court. He then pleaded true to both enhancement paragraphs, and the court sentenced him to 25 years confinement.

On this appeal, appellant challenges the sufficiency of the evidence to support his conviction. Specifically, he asserts that the evidence was insufficient to support his conviction under the law of parties because the burglary was completed before he did any act to aid, assist, or encourage its commission; that there was no evidence showing he asserted any distinct control over the stolen property, and his explanation, when confronted at the scene of the crime, was a reasonable one; and finally, that the State introduced two written statements that tended to show that appellant did not know that a burglary had been committed, and then the State failed to offer any evidence rebutting those statements.

The State's evidence-in-chief consisted principally of the testimony of the home owner, whose house was burglarized, and that of one of the police officers who investigated the offense.

The complainant, Dr. John Livesay, testified that on the day of the burglary, he was away from his home about an hour and a half and returned at about 5:30 p.m. When he entered his house, he found several items out of place and some stereo equipment missing. He first called the police and then noticed that the burglars had left some items untouched. Concerned that the intruders were still on the premises, he looked outside through some French doors. He saw a man, later identified as Robert Mayo, standing by a fence that separated his yard from the adjacent property. Mayo was passing stereo equipment through a hole in the fence to appellant, who was loading them into a Volkswagon automobile parked in the adjacent driveway.

Dr. Livesay testified that when the two men saw him looking at them, they jumped into the car and started backing out of the driveway. Dr. Livesay picked up his .357 magnum pistol and ran out through his front door and into the street. He saw the vehicle back into the street and then start forward. Dr. Livesay chased the departing car, and then reached through the open

passenger window with both arms and pulled the keys out of the ignition. As he did this, both men exited the car from the driver's side, and the car came to a stop. One of the men, Robert Mayo, ran away from the scene. Appellant went to a house across the street and asked the occupants of the house if he could use the telephone. They refused his request, and appellant then waited in front of the house until the police arrived several minutes later.

A turntable, tape deck, and amplifier were found inside the Volkswagon. The wires had been cut on several pieces of the equipment. A television and a video cassette recorder were still stacked inside the fence on the complainant's property.

When the police arrived, appellant was placed under arrest. He told the police that he did not know his companion's last name, but said that if the police would take him to a nearby lounge where appellant worked as a disc jockey, someone could tell them the name of his companion and where the man lived. The police and appellant went to the lounge and obtained the information. The police later found and arrested Robert Mayo. Mayo made the following statement to the police after his arrest:

My name is Robert Kenneth Mayo Jr. and I am 20 years old. I live at 1721 Wichtia [sic] #9. I graduated from the 8th grade, but I can not read nor write. On 081986 at about 5:30 PM Anthony, I do not know his last name, came to my house and told me "I KNOW THIS HOUSE WE CAN BURGLARIZE." At this time Anthony and I went to 1812 Rosedale. When we got there I saw some property stacked up by the fence. The side door was open and Anthony and I went inside. Once inside I found that Anthony had stacked up a TV and a receiver in the living room. We took this property out side and stacked it with the rest of the property. We did not have any way to transport the property so we left walking trying to find someone with a car. We saw a red VW parked in the Almeda lounge parking lot and I knew this vehicle belonged to Darrell. We went inside the lounge and talked to Darrell. Anthony told Darrell "WAS HE DOWN TO MAKE SOME MONEY" and Darrell said that he was game. Anthony said that he had this JVC system, color TV and a turntable. Anthony said that he was going to take it to his cousin and he will give us cash money for it. Darrell ask am I going to get my cut and I said yes. I got into the red VW with Darrell driving and Anthony walked. We drove up to the house we had burglarized and Darrell parked in the house next doors driveway. Darrell stayed in the car and I got out and got the property we had stacked up and handed it to Darrell who was placing the property in the back seat. The next time I reached throught [sic] the fence to get some more property the owner of the property came up and I jumped into the VW and Darrell backed up. At this time the owner of the house ran out his front door and ran up to the VW and took the keys out of the car. During this time Darrell told me to run which I did to some apartments on Wichita where the police arrested me. About ten days ago I broke into this same house and was going through the owners billfold when he came in and I took off running. This time I got away. I am currently on parole for burglary and I am wanted at this time for parole violation.

Appellant gave the following written statement to the police after his arrest.

My name is Darryl Gene Boudreaux and I am 36 years old. I was born September 14, 1949 in Beaumont, Texas. I attended Yates High School and graduated in 1967. I can read and write the English language. On 8-19-86 I was at work at the Almeda Lounge located at 4501 Almeda. At 5:30 p.m. this dude came by the lounge and asked me if I would give him a ride. I asked him where he wanted to go and he said right around the corner from the auto parts store. I told him that he could walk that far and the guy told me that he had some stuff that he had to move and that he needed a ride for it. I had seen this dude on several occasions as he came into the club several times in the past. I then

asked him how long it would take if I took him to pick up this property and the dude said that he needed me to carry him to Cleburne and Dowling, to Cleburne Manor Apts. I told him that I did not know and he said if I wanted to make some money. I told him sure and that I needed to make some money. We got into my car which is a 1965 Volkswagon and we went to Rosedale Street. He told me to drive up in this driveway that was to a two story house. The house sat on the left side of this driveway but the dude walked over to the right side to the fence of the house next door. The fence had a few boards missing and I saw him reach inside the fence and get some stereo stuff. I never got out of my car because if it stops I have to get it jumped off. I have to keep my foot on the excellerator [sic]. I stayed behind the wheel with the car running. The dude brought the stereo stuff which was a turntable and some other stuff and put them in the back seat of my car. After he put the third piece of stereo equipment in the car I noticed that he was nervous and appeared to be in a big hurry. At this time I asked him if the stuff was hot and the dude said just hurry up. He jumped in the car as I was backing out of the drive way. When I got to the street I saw this man run out of the house where the broken fence was at. At this point I stopped my car and told the dude to get out of my car. The dude got out and ran at the same time the other man got to my car. I got out of my car and the man reached inside my car and took my car key out.

Then the man that took my car key went back inside his house and I went across the street to the people who were sitting on their porch and asked if I could use the phone. They would not let me use their phone and told me that some one was using the phone. I stayed there on the porch with them until the police showed up. I then went to the police car and tried to explain to them what had happened. I heard the other man tell the police that I was inside his house and I told him he was a liar, but the police put me in the back seat of the police car. The police continued to talk with the other man for a while longer and then they came back to the police car. I told them that someone at the club where I worked [would] be able to verify my story as to how long I was at the club and someone was bound to know the name of the dude that I gave the ride to. We went back to the club and the bartender knew the dudes name and he told it to the police officers. I told them where I was suppose to take him and we went to that location but the dude was not there. The police then went to where the dude was suppose to live at and some little girls told the officers that the dude did come and change clothes and then went to an apt. down the street. The officers then went to the location where they were directed and arrested the dude. I told them that he was the person that I gave the ride to.

There are people who can testify [that] I was not gone long enough to break into nobodys house and they can also tell officers that I had been at the club.

I have not been promised anything for making this statement and I make this statement of my own free will. I have not been threatened or forced into making this statement.

At trial, a portion of appellant's statement was corroborated by another employee of the lounge. The employee testified that two men, one of whom he knew only as Robert, came into the lounge and approached appellant. After they talked a few minutes, appellant asked the other employee to watch his records because he was "going to help some dudes move some stuff." He estimated that appellant returned about 10 minutes later with a policeman. The policeman was asking questions about Robert and wanted to know where Robert lived. A third employee knew that Robert's last name was Mayo and told the police where Mayo lived.

Appellant testified in his own behalf. He admitted several prior convictions for felony theft and for carrying a weapon. He said he knew Robert Mayo because Mayo

came into the club where he worked. He testified that he operated the club's record booth during "happy hour," usually from 5 to 8 p.m., and that on the afternoon of the burglary, he was intending to start his work at 6:00 p.m. He said that about half an hour before he was to begin work, Mayo and another man approached him, and Mayo asked him if he would give him a lift, saying he needed to pick up "some stuff." After being assured that it would not take long, appellant agreed to help Mayo.

Appellant testified that Mayo directed him to a nearby house and told him to park his car in the driveway. Mayo got out of the car and soon returned with some stereo equipment. Mayo loaded the equipment in the back seat of the vehicle and walked over to the fence. He reached through a hole in the fence, picked up a turntable, and returned with it to the car. Appellant asked, "Man, what's going on?" "Is this stuff stolen?" Mayo replied, "No, man, let's get out of here. Let's go right now." Mayo then jumped in the car and closed the door, and appellant backed the car into the street and stopped the car.

Appellant testified that he tried to tell Mayo he "was not going through with this," and that Mayo would have to get out of the car. He said that he looked back and saw a man come out of the house, run toward the car, and yell for them to stop. Mayo said, "Let's go, man." Appellant replied, "No. What am I going for?" Mayo then said, "Well, you better run." Appellant replied, "No, you run." Mayo then crawled across him as fast as he could, and at the same time, the man reached through the window and pulled the keys from the ignition. He said the man did not have a weapon and did not place both his hands inside the car. Appellant said that he got out of the car and followed the man, trying to explain that he had just been giving Mayo "a lift." He said he then walked up to the house across the street and asked to use the telephone to call his place of work. He was denied use of the telephone, and he waited by the house until the police arrived.

Robert Mayo, an inmate at the Texas Department of Corrections, also testified for the defense. He said that he and a young, white male friend, whom he refused to identify, had formulated the plan to burglarize Dr. Livesay's house. On the afternoon in question, he gained entry to the house and proceeded to burglarize it while his friend stood as a "watchout" on the corner. He knew the doctor might come back to his house between 4:30 and 5:00 p.m., and his "watchout" knew Dr. Livesay's automobile. Mayo took television and stereo equipment from the house and stacked it near a fence in the yard. He kicked out several fence panels so he could pass the equipment through the fence to the adjacent property.

Mayo testified that he and his friend then went to several apartments in the neighborhood to try to find someone who would help them transport the stolen goods. He said he talked to five or six people, but they all refused to help him, saying they did not want to get involved. He then talked to appellant, who was a friend of his girlfriend's mother, after he saw appellant's car parked at the side of the lounge. He said he did not explain why he needed the transportation, nor did he mention the risks involved. He testified that appellant stayed in the car while he went to get the stolen property, and that appellant watched him go through the fence. He refuted Dr. Livesay's testimony that he had passed the stolen equipment into appellant's hands. He said that as he was putting the equipment in appellant's car, he heard someone say "Hey, stop." He jumped in the car, and told appellant to pull out of the driveway, to which appellant said, "For what?" He then explained that the equipment belonged to the man who had called, and he told appellant to "Hurry up and pull out the driveway." He testified that when Dr. Livesay stuck his hand through the window, turned the ignition off, and took the keys out of the car, he was still seated in the front seat. He said he crawled over appellant and out of the car and told appellant to run. Appellant replied, "Run for what? I ain't fixin to leave my car here." He said that appellant

further stated that he wasn't going to run because he was caught.

Mayo testified that he did not recall saying, in his written statement, that appellant was "Down to make some money." He also denied that he had offered to pay appellant any money in return for appellant's help. He further testified that he did not recall having an earlier conversation with the prosecutor, in the presence of another individual, in which Mayo told the prosecutor that appellant knew exactly what was going on before they left the lounge.

As a rebuttal witness, the State called Mr. Donald R. Davis, a lawyer, who testified that he had been present at a discussion between the prosecutor and Robert Mayo several days earlier. He testified that the prosecutor asked Mayo when appellant knew what was happening, and Mayo said, "Before we went to the place."

In his first point of error, appellant contends that the evidence was insufficient to support his conviction for burglary under the law of parties because the evidence shows that the burglary was completed before appellant did any act to aid, assist, or encourage Mayo in the commission of the offense.

The charge to the jury authorized a conviction if the jury found that appellant acted alone or with another as a party to the offense. The jury charge instructed the jury concerning the law of parties as follows:

All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

The State presented no evidence to show that appellant acted alone in the commission of the burglary or that he actually entered the residence or was present to aid or assist Mayo in the burglary. The evidence presented by the State and the final arguments by the State make it clear that the State was relying on the law of parties for its conviction.

In its closing argument, the State said:

The issue here is whether or not this man knew what was going on. Now we talk about law of parties. If somebody aids or assists another person in completion of the crime that that [sic] person is considered a party. Now what do you know happened out there that would lead you beyond a reasonable doubt that this guy knew what was going on? What do we know about Darryl Boudreaux? ...

We know that Mayo went over to the Almeda Lounge and talked to him. By the defendant's own admission, it took him four, maybe five minutes for him to be persuaded to go along. Why? Why? Because he knew there was something funny going on....

He drove up to this driveway. I don't think there is any question about that. But what you need to key on what would a reasonable person have thought when they drove up in this driveway? ...

Well, this guy drives up into the driveway and wants you to think he is just sitting at the wheel, not doing anything, just sitting there. He notices the fact Mayo gets out of the car and starts taking stuff through the fence. We go along with his version of the fact....

No question Darryl Boudreaux knew what they were doing out there moving the property. Under that scenario of events, I think it's clear he had to know what was going on. He was a party....

All I'm going to ask you to do is go back there and make the decision that you know and I know is the right decision, that he is guilty of burglarizing Dr. Livesay's habitation because he was a party to the offense. Thank you.

■ A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex.Penal Code Ann. sec. 7.02(a)(2) (Vernon 1974). To determine whether an individual is criminally responsible for the conduct of another, a court may look to events before, during, and after the commission of the offense. *Morrison v. State*, 608 S.W.2d 233, 234 (Tex. Crim.App.1980). There must be evidence of a common purpose or design *prior to, or contemporaneous with* the criminal event. *Urtado v. State*, 605 S.W.2d 907, 911 (Tex. Crim.App.1980); *Medrano v. State*, 658 S.W.2d 787 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd).

In reviewing the sufficiency of the evidence to sustain a conviction, this Court must view the evidence in the light most favorable to the prosecution, and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ In this case, the State presented no evidence to show that there was an agreement between appellant and Mayo prior to or contemporaneous with the burglary. In fact, the State has never contended that there was any contact between Mayo and appellant until Mayo approached appellant at the lounge after the burglary had taken place. The State defined the issue as "whether or not this man knew what was going on." The State then argued that appellant must have known what was going on and therefore was guilty as a party.

The State cites *Alexander v. State*, 607 S.W.2d 551 (Tex.Crim.App.1980), as a case with "amazingly similar" facts. But there is an important distinction in *Alexander*. There, it was uncontroverted that appellant drove the two burglars to the scene of the burglary in his car, waited for them while they broke into the house, and drove away with them and a stolen television set. The *only* similarity is that the appellant testi-

fied that he did not knowingly participate in the burglary. The Court of Criminal Appeals held that the trial judge was not required to believe the appellant's testimony. *Id.* at 553.

In this case, even if the trier of fact does not believe appellant's testimony, there is still no evidence to show a common design prior to or contemporaneous with the burglary, and all the evidence indicates that appellant committed no culpable act until *after* the burglary. *See Medrano*, 658 S.W.2d at 792. The testimony tends to show that appellant came into the cause after the burglary had been completed without any knowledge that he was, at the time of "giving a lift" to Mayo, participating in a "burglary of a residence." At most, there may be a *speculation* that appellant acquired the knowledge that the items in his vehicle were stolen by Mayo. But that knowledge alone could not be sufficient to support a conviction for burglary.

The dissent finds the evidence sufficient to sustain the conviction based on circumstantial evidence, which consisted of Dr. Livesay's testimony that he saw appellant standing outside the fence loading the stolen equipment into a car. The State did not rely on circumstantial evidence, nor could it, because Dr. Livesay's testimony did not exclude every other reasonable hypothesis. *See Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Crim.App.1984).

The dissent relies on *Morrison*, 608 S.W. 2d 233, for the proposition that events before, during, and after the commission of an offense may be considered in deciding whether a person is criminally responsible for the acts of another. But *Morrison* goes on to state that "[a]cts committed *after* the [offense] was completed could not make appellant a party to the offense.... The circumstances must prove some culpable act *before or during* the [offense]." 608 S.W.2d at 235 (emphasis added).

The State argues that the removal of the stolen property from the yard was the *completion* of the offense of burglary. But the uncontested testimony of Mayo was that he broke into the house alone, re-

moved the property, and stacked it in the yard near the fence. He then left the premises and went in search of someone who would help him move the property. Had appellant been charged with and convicted for the offense of theft, we would be in full agreement with both the State and the dissent. But the State has offered no evidence to prove that appellant was a party to the burglary.

Appellant's first point of error is sustained.

▇ In his second and third points of error, appellant contends that the evidence was insufficient to support his conviction because the State introduced statements by appellant and Robert Mayo that were exculpatory to appellant, and the State offered no evidence to rebut the statements. Appellant relies on the voucher rule in which the State is bound to disprove, beyond a reasonable doubt, exculpatory evidence contained within a statement offered by the State. *Palafox v. State,* 608 S.W.2d 177 (Tex.Crim.App.1979).

The State argues that it is no longer bound by exculpatory evidence that it introduces because of Tex.R.Crim.Evid. 607, which reads, "the credibility of a witness may be attacked by any party, including the party calling him." The State cites *Ibanez v. State,* 749 S.W.2d 804 (Tex.Crim. App.1986), in which the majority agrees with a statement made in the dissent that the voucher rule, as set forth in *Palafox,* "seems to be abolished" by rule 607. The State also cites *Stills v. State,* 728 S.W.2d 422 (Tex.App.—Eastland 1987, no pet.), for the proposition that the State is no longer bound by exculpatory evidence that it elicits.

Although it is undoubtedly true that, under rule 607, the State is not bound by exculpatory evidence that it introduces and may impeach its own witnesses, the State in this case offered no evidence to contradict those portions of both statements showing that appellant was not involved in the burglary.

Appellant's second and third points of error are sustained.

In his fourth point of error, appellant contends that the evidence was insufficient to support his conviction because he was not seen exerting distinct control over the property and gave a reasonable explanation for the property that was found in the backseat of his car.

In response, the State argues that this is not a circumstantial evidence case and that the victim caught appellant "red handed" taking the items as they were being passed through the fence. We agree with the State that this is not a circumstantial evidence case. The direct evidence admitted by the State may have been sufficient to convict appellant of theft. However, it was not sufficient to convict him of burglary.

We sustain appellant's fourth point of error.

The judgment of the trial court is reversed, and a judgment of acquittal is rendered.

EVANS, Chief Justice, dissenting.

I disagree with the majority's holding that the evidence is insufficient to support appellant's conviction.

The undisputed evidence shows that appellant was apprehended at the scene of the burglary, in possession of stolen goods, shortly after the offense was discovered. The complaining witness, Dr. Livesay, testified that he saw appellant actively removing the stolen equipment from the yard of his home, and when he shouted at appellant and the other man with him, both men tried to leave in their automobile.

In my opinion, this evidence was sufficient proof of appellant's participation in the offense of burglary. *See Alexander v. State,* 607 S.W.2d 551, 553 (Tex.Crim.App. 1980); *Hill v. State,* 135 Tex.Crim. 567, 121 S.W.2d 996 (1938) (evidence showing juxtaposition of accused crime held sufficient to support conviction); *see also Smith v. State,* 96 Tex.Crim. 188, 256 S.W. 262 (1923); *Osby v. State,* 88 Tex.Crim. 418, 227 S.W. 322, 323 (1921); *Jackson v. State,* 28 Tex.Crim. 370, 13 S.W. 451 (1890).

I acknowledge that appellant, when first confronted by the police, gave an exculpa-

tory explanation of his involvement, which was generally corroborated by the testimony of the co-principal Mayo and several other defense witnesses. But the jury was not bound to believe appellant's explanation, nor to accept the corroborating testimony of the other defense witnesses. It was for the jury to decide whether appellant's explanation was reasonable *and true. Adams v. State*, 552 S.W.2d 812, 815 (Tex.Crim.App.1977); *Smith v. State*, 518 S.W.2d 823, 825 (Tex.Crim.App.1975); *see also Jackson v. State*, 672 S.W.2d 801 (Tex. Crim.App.1984).

The testimony of the complainant, Dr. Livesay, was clear, direct, and positive. He discovered the burglary as soon as he returned home, and on the assumption that the burglars might still be on the premises, he looked outside. There, he saw appellant receiving the stolen equipment from Mayo and packing it in his automobile. In my opinion, the jury could reasonably have decided, based on this evidence alone, that appellant and Mayo had planned and executed the burglary together. *See Alexander*, 607 S.W.2d at 553; *see also Callahan v. State*, 502 S.W.2d 3, 4–7 (Tex.Crim.App. 1973).

Appellant argues that Mayo's criminal act of burglary was completed "the very second" that he entered the house, and that appellant's later participation in the criminal activity was insufficient to establish his participation in the offense.

I disagree with appellant's rationale. The jury was entitled to accept Dr. Livesay's version of the incident, and to reject appellant's story. Thus, the jury could reasonably have found beyond a reasonable doubt that appellant was engaged in the criminal activity while the burglary was in progress and before the offense was completed.

As the court instructed the jury, a person is criminally responsible for the offense of another if, acting with the intent to promote or assist in the commission of the offense, he aids or encourages the other person in committing that offense. Tex.Penal Code Ann. sec. 7.02(a)(2) (Vernon 1974). In deciding whether a person is criminally

responsible under the law of parties, the jury is entitled to look to events before, during, and after the commission of the offense. *Morrison v. State*, 608 S.W.2d 233, 234 (Tex.Crim.App.1980).

A person may be guilty of the offense of burglary, even though he did not personally enter the burglarized premises, if he acted with another in the commission of the offense. *See Clark v. State*, 543 S.W.2d 125, 127 (Tex.Crim.App.1976). Proof of the elements of entry and intent to commit theft, as well as of the parties' agreement to act together in committing the offense, may be supplied by circumstantial evidence. *Clark*, 543 S.W.2d at 127; *see also Fagan v. State*, 708 S.W.2d 34, 36 (Tex. App.—Dallas 1986, pet. ref'd); *Draper v. State*, 681 S.W.2d 175, 177 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd); *Taylor v. State*, 630 S.W.2d 469, 472 (Tex.App. —San Antonio, 1982, no pet.); *Fantroy v. State*, 474 S.W.2d 490 (Tex.Crim.App.1971) (agreement to act together).

Here, there was evidence from which a rational trier of fact could have found beyond a reasonable doubt that Mayo and appellant acted with a common purpose and intent in burglarizing complainant's house, and that this understanding existed contemporaneously with the criminal offense. *Compare Utardo v. State*, 605 S.W.2d 907, 911 (Tex.Crim.App.1980); *Medrano v. State*, 658 S.W.2d 787 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd).

I would hold that the proof is sufficient to support the jury's verdict, and would therefore overrule appellant's first and fourth points of error.

I also disagree with the majority's conclusion that appellant's second and third points of error should be sustained. In those points, appellant contends that the State was bound to disprove exculpatory explanations contained in the written statements made by appellant and Mayo. The majority opinion recognizes that Tex.R. Crim.Evid. 607 abolished the so-called voucher rule, as set forth in *Palafox v. State*, 608 S.W.2d 177 (Tex.Crim.App.1979). But even so, the majority concludes that the State offered no evidence to contradict

the portions of the written statements that tended to show appellant had not been involved in the burglary. I disagree with the majority's analysis of the evidence, because in my opinion, the State's proof did tend to contradict appellant's version of the incident. Rebutting the statements of appellant and Mayo, Dr. Livesay testified that he saw appellant standing outside his automobile receiving the stolen equipment from Mayo through the fence, and that when he shouted, both men jumped in the car and tried to drive away. Thus, the jury could have inferred from Dr. Livesay's testimony that Mayo and appellant acted together in burglarizing Dr. Livesay's home, and that they were still in the process of removing the stolen equipment when discovered by Dr. Livesay. Appellant's only response to Dr. Livesay's testimony was that he was "lying." In my opinion, Dr. Livesay's testimony tended to rebut appellant's version of the entire incident, and the State was not bound by the exculpatory statements of appellant and his co-principal, Mayo.

I would affirm the trial court's judgment.