**Affirmed and Opinion Filed June 8, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01510-CR

**THOMAS GRADY LAYTON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-82182-10**

## MEMORANDUM OPINION

Before Justices Bridges, Fillmore, and Brown
Opinion by Justice Bridges

A jury convicted appellant Thomas Grady Layton of capital murder, and the trial court

sentenced him to life imprisonment without the possibility of parole. On appeal, Layton argues

the evidence is insufficient to establish he committed the murder in the course of committing

robbery, and his conviction was based on insufficiently corroborated accomplice witness

testimony. We affirm the trial court's judgment.

### Background

Grada Layton lived at 2313 Cross Bend Road (Cross Bend) in Plano, Texas. After the

death of her husband several years earlier, she became a homebody and neighbors rarely saw her

although they described her as a sweet, caring woman who financially supported her wayward

son Thomas Grady Layton. Layton was a self-admitted methamphetamine user and his previous

legal trouble included felony burglary of a habitation, felony delivery of marijuana, felony

manufacturing or delivering a controlled substance, felony burglary of a vehicle, and misdemeanor possession of marijuana. Layton's stepson, Matthew Kubasta, called Layton a "freeloader."

As long as Kubasta knew Layton, Layton had an "extreme hatred" for Grada. He would say, "F that bitch. I need to kill her. You know, I need to shoot her." Kubasta heard the threats for so long that he did not believe them or take them seriously.

Layton lived with Grada off and on at Cross Bend, but also stayed at 1805 Bronco (Bronco), which was a home in Granbury, Texas also owned by Grada. Layton claimed he moved out of Cross Bend on Monday, May 24, 2010 and went to Bronco. Kubasta also stayed off and on with Layton at Bronco.

Despite Layton's claim that he did not return to Cross Bend until Sunday, May 30, neighbors reported seeing him on Tuesday, May 25 and Wednesday, May 26. Specifically, Whitney Carlstone, who lived next door to Grada, said Layton had been gone for about three weeks. He told various neighbors he was going back to Granbury because "the police had it out for him." However, Carlstone saw Layton on Tuesday, May 25 in the early afternoon. She saw Layton one more time the following day before she left town. Raymond Bittel also lived by Grada, and he testified to seeing Layton on Tuesday, May 25.

Around May 25 or 26, Kubasta saw Layton "marking bullets up" at Bronco. Kubasta explained this process as hollowing the tips and scratching them up to make the bullets harder to identify through ballistics. Not until May 26 did Kubasta see a gun, which he recognized as Grada's .38 Smith & Wesson police special. Kubasta had seen the gun before when he visited a deer lease with Layton. He thought Layton took it from Grada's house on May 23.

After Layton finished with the bullets, Kubasta helped him construct a makeshift silencer for the gun. Layton talked about killing Grada the whole time he was marking bullets and they

were making the silencer. Kubasta did not try to change Layton's mind because Kubasta did not think he was serious.

On the night of May 26, Layton took Christyn Valentin's Toyota Corolla and drove back to Cross Bend. Valentin was Kubasta's girlfriend at the time. Layton told Kubasta he did not want to get caught on traffic cameras in his or Grada's car. When Layton left, he said he was going to kill Grada. He took the gun and silencer with him.

Layton later described to Kabasta how he killed Grada. Layton said the two watched television for about an hour and then he retrieved the gun from the garage. He walked back in and shot her in the back of the head. He checked on her breathing a few times and then shot her again. Layton later admitted to police that he took credit cards and a debit card from Cross Bend after killing Grada.

Around 3 a.m., Layton called Kubasta from a 7-Eleven in Benbrook because the Corolla had a flat tire. Kubasta drove Grada's Sunfire to meet Layton. After an unsuccessful attempt to change the tire, they left the car at the gas station. Layton moved items he had taken from Grada's home, along with the pistol, and put them in the Sunfire's trunk. Kubasta said the main thing that stuck out to him was Grada's purse in the plastic bag. At this point, Kubasta was still not sure if Layton had killed Grada because, "it almost looked like he just robbed her because of some of those things." He said Layton had taken money from Grada's purse before, which she left in the kitchen, so Layton could have easily taken off with it.

In the early hours of May 27, Kubasta recalled seeing Layton shuffle through some papers he took from Cross Bend and spread them out on the coffee table. He remembered seeing a house deed, old collector coins, and a pocket watch. Kubasta also recognized Grada's Oakley sunglasses and said they came from her purse. Surveillance video captured Layton wearing

these same sunglasses shortly after the murder. Layton explained to Kubasta that he took these things because he could easily carry them out, and it would make it look like a robbery.

The following day, Layton went outside and Kubasta heard digging sounds next to the home. Although Kubasta did not go outside to confirm, he assumed Layton buried the gun because he took the gun outside but returned without it. The gun was never found.

Around 8 pm on May 29, Officer Randall Burns with the Plano police department received a call to conduct a welfare check at Cross Bend. Layton had called the police claiming to be concerned about Grada because he had not talked to her in several days. Layton told Officer Burns he was completely broke, unemployed, and Grada helped him financially.

Officer Burns walked the perimeter of the house, looked for obvious signs of a break-in, and knocked on the door. He found nothing suspicious. All doors and windows were secured. Officer Burns called Layton back and told him he found nothing suspicious and encouraged Layton to visit the house himself if he had continued concern. Layton mentioned he would have to use an emergency credit card Grada provided him because he did not have extra money to travel from Granbury to Plano.

Layton and Kubasta drove back to Cross Bend the night of May 29. Kubasta said on the way back, they stopped at a gas station and Layton threw away a pink trash bag, which he thought contained Grada's purse. When they arrived at the house, Layton told Kubasta to open a window upstairs so it looked more like a robbery. The two men determined they would throw suspicion on Michael Grippe and Leslie Hutson for the murder.

Michael Grippe had known Layton for years. He got to know Grada when he and Hutson, his girlfriend, moved into the converted apartment on the second story of Cross Bend. According to Layton, the two took advantage of Grada and did not treat her well. However, Grippe said they moved out on amicable terms.

–4–

Grippe knew Grada loved Layton, but he also said Grada did not like her son. When asked if Grada had any enemies, Hutson said, "Her son . . . He hated her. He had said it before. He treated her horribly."

In the past, Grippe said Layton had pointed out items of value in Cross Bend. Grippe specifically mentioned Layton's desire to have Oakley sunglasses because "We all had Oakleys back then. You know, that was the big thing." Layton also mentioned to Hutson a large inheritance he expected to get when Grada died.

After Kubasta and Layton returned to Cross Bend and found Grada's body, they called police. Officer Charles Wright received the call shortly after midnight on May 30 to assist the fire department with a deceased person at Cross Bend. When Officer Wright arrived, he entered the residence and located Grada's body in the living room recliner. He then met with Layton and Kubasta in the front yard.

Officer Wright testified Layton appeared to be under the influence of some narcotic because he was very sleepy, groggy, and unsteady on his feet. Layton spent most of the time lying on the sidewalk in front of the house. Layton and Kubasta told Officer Wright they decided to check on Grada after the welfare check and that is when they discovered her body. Kubasta mentioned a man by the name of Michael, who had recently lived in the home with Grada.

Layton told Officer Chris Poligala he had not spoken to Grada since Wednesday, May 26. During that phone call, Layton admitting to asking Grada for money, and she agreed to transfer some to his bank account. When the money did not arrive and he did not hear from her, he decided to check on her. After talking with Layton, Officer Poligala entered the house, which he described as cluttered, but not ransacked or burglarized. Upon viewing Grada's body, officers determined they were dealing with a potential homicide, so they removed everyone from the

house, secured the crime scene, and waited for Sergeant Michael Boese to obtain a search warrant.

Sergeant Boese arrived and spoke to Kubasta. He never talked to Layton because he was asleep on the sidewalk. Kubasta said the last time he was at the residence was Saturday, May 22. Sergeant Boese left and then returned with a search warrant. Dr. William Rohr, a Collin County medical examiner, arrived around the same time. Dr. Rohr later determined someone intentionally and knowingly caused Grada's death by shooting her twice at an indeterminate range. One bullet passed through her brain and the second passed through the soft tissue of the left breast.

Sergeant Sandra Rogers-Tomeo assisted in the search of Grada's house. She found a desk drawer completely empty, and this was significant because the other drawers were full of items. In her opinion, something had been removed from the drawer.

Officer Clifford Turrubiarte interviewed Layton that night. Layton admitted Grada provided him financial support. He also described Grada as, "[M]y money hole. You know, my money tree." He said, "I had to steal, well, I didn't steal. I used one of her credit cards okay that I've been told not to use in case of emergency. And I needed to go out there." He told Officer Turrubiarte he noticed Grada's purse was gone because it was always in the same place by the back door. He also said $10,000 to $15,000 from a recently sold property and coins were in the safe.

A few days later, Kubasta confided in Valentin about the murder. She encouraged Kubasta to report what he knew to the police. He was finally motivated to return to the police out of fear that Layton might hurt him. On June 4, Kubasta returned to the police for a second interview. He told them Layton's version of the murder and about the property Layton took from Grada's home, including the Oakley sunglasses.

On June 4, 2010, Sergeant Boese and Detective Elizabeth Spillman executed the search warrant at Bronco. Based on information from Kubasta, Detective Spillman looked for collector-type items and sunglasses. She was also asked to retrieve any tools because the bullets recovered from Grada's body appeared to be altered.

Inside a trashcan, Sergeant Boese found a receipt for a withdrawal from a Compass Bank checking account on June 1, 2010. He found Grada's checkbook inside a desk drawer. He also found a receipt for $512.08 for purchases made with a debit card on June 2, 2010. Inside the living room, a stack of cash was paper-clipped and hanging from the ceiling fan. He also found a broken methamphetamine pipe and Grada's sunglasses. Later DNA analysis confirmed that both Grada's and Layton's DNA were present on the sunglasses. He also found collector coins. Detective Spillman said they did not seem to belong because of the condition of the residence. The coins were also the types of items someone would keep in a safe, and she knew Grada's safe had been emptied. She also found a bag containing two-dollar bills.

Shellie Dacy, Grada's niece, found out about Grada's death from Layton. He called her from the police station when he was first questioned on May 30. He stopped by her home later that day and told her he thought Grada died from a gunshot wound because of the gash on her head. He also told her Grada's safe was empty. He also mentioned the possibility of eight to ten thousand dollars in cash being in Grada's house from the sale of a previous home in Granbury. Dacy said no such money was found in Cross Bend after Grada's death. However, in late August when the police released the home to her, she found two broken "money straps," indicating they had held $4,000 cash each, on a shelf in Grada's bedroom closet. She said the straps appeared to have been torn apart. She knew Grada had several old coins, but she could not specifically identify any of the ones found at Bronco.

Whalen Dacy, Shellie's husband, helped clean out Grada's house after her death. He observed that the antique coins and a bunch of two-dollar bills were missing. He knew of the coins and bills because they originally belonged to "MoMo," Grada's mother, and she had showed them to him after he expressed interest in coins. He admitted the first time he saw the coins and bills was at the Bronco house, which had previously been MoMo's house. Upon MoMo's death, however, Bronco was completely cleaned out. The next time he remembered seeing MoMo's things was when they cleaned out Cross Bend. He remembered seeing everything of MoMo's at Cross Bend except the coins and bills. He believed the coins and bills had been at Cross Bend prior to Grada's death.

Detective Jerry Minton assisted with the financial side of the criminal investigation. He testified Layton made ATM withdrawals beginning on May 30, and in the span of four days, he withdrew $2,700 from Grada's account. Before Grada's death, her account contained $6,409. On June 3, Layton depleted the account to $1,809.11. However, Shellie Dacy testified that as Layton's trustee, she had to give permission for him to get money, and she admitted he did not "just go out and start making charges on a debit card without anyone knowing what he was doing."

Layton was arrested on June 4, 2010 in Granbury. Layton's wallet was seized and Grada's gold credit card and a Mastercard were found inside.

Officer Turrubiarte interviewed Layton again on June 22. By this time, officers had talked to Valentin and corroborated Kubasta's story about Layton driving Valentin's Corolla and experiencing car trouble on May 26. When Officer Turrubiarte asked Layton if he had ever driven Valentin's car or had any car trouble with it, Layton denied both. Layton also said he did not take property from Cross Bend "but there should be money in there, coins, money in the safe."

When asked if he liked Grada, he said, "Yeah, I loved my mom to death." However, he then said, "She's never supported me in any of my wants or any of my wishes."

The State charged Layton with intentionally and knowingly causing the death of Grada while in the course of committing or attempting to commit robbery. The jury found Layton guilty of the charged offense, and the trial court sentenced him to life imprisonment without the possibility of parole. This appeal followed.

## Sufficiency of the Evidence

In his first issue, Layton argues the evidence is insufficient to support his capital murder conviction because the State failed to establish he killed Grada in the course of committing robbery or took any property without her effective consent. The State responds the evidence is sufficient to establish murder in the course of a robbery and that Grada did not consent to the taking of her property.

In a legal sufficiency review, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury, as the sole judge of witness credibility, is free to believe or disbelieve all or part of a witness's testimony. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

As charged in this case, the State needed to prove Layton intentionally committed the murder in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2014). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. *Id*. § 29.02(a)(1) (West 2011). A person commits theft if he unlawfully appropriates property with intent to

–9–

deprive the owner of property. *Id*. § 31.03(a) (West Supp. 2014). Appropriation of property is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b)(1).

Layton argues the State provided insufficient evidence that the murder took place during a robbery or in the immediate flight therefrom. He contends the record equally supports a conclusion that the robbery, if any, happened in the days leading up to Grada's murder or in the subsequent days after her death.

For example, Layton argues the undisputed testimony showed he took Grada's .38 special on May 23, which was days before he killed her. Also, the broken cash straps found in Grada's closet were not discovered until approximately two months after her death. Further, although Kubasta testified Layton transferred a plastic bag of items from the Corolla to the Sunfire in the early hours after Grada's death, there was no evidence confirming exactly when Layton took these items. He argues it was plausible he removed them at some earlier time prior to her death. Layton makes similar arguments as to his possession of the coins and sunglasses—that one could reasonably infer Grada gave these items to him or at the very least, let him borrow them because she was known to provide for him.

Reviewing the record in the light most favorable to the verdict and considering the jury's role as the sole judge of witness credibility, we disagree with Layton's arguments. While Layton's arguments could be supported by possible inferences from the factual record, the jury rejected them.

While both sides argued Layton did not kill Grada only for her sunglasses or the coins, the evidence established he took them during the course of the murder. Grippe testified to Layton's desire to have Oakley sunglasses. Kubasta testified Layton had them with him upon returning from Cross Bend on May 26. Surveillance video from that night also showed Layton wearing the sunglasses.

–10–

Layton himself told officers the coins should have been in Grada's safe, yet when officers searched, they did not find any. Whalen Dacy testified he believed the coins and two-dollar bills were at Cross Bend, and he remembered seeing everything of MoMo's at Cross Bend when they cleaned out Grada's house except the coins and bills. Dacy identified some of these items, which officers recovered during the search of Bronco. Kubasta also testified Layton spread the coins and bills out on the coffee table when they returned to Bronco after switching cars. These items were most likely not present in Bronco before Layton's trip to kill Grada because Kubasta said they would have pawned them for drugs. Thus, the testimony indicated certain property had not been at Bronco very long and because the property appeared after Layton returned from killing Grada, the jury could reasonably infer Layton took the property in the course of committing the murder.

In reaching this conclusion, we are unpersuaded by Layton's argument that he merely took property to make it look like a robbery, but did not in fact commit robbery. He relies on *Palafox v. State*, 608 S.W.2d 177 (Tex. Crim. App. 1979) to support his position. In that case, the defendant confessed to killing the victim and stated he took items to make it look like a robbery. *Id*. at 182. The law at that time stated, "When the State has placed in evidence a confession or statement of the accused which is exculpatory, the State is bound thereby unless the other testimony demonstrates the falsity of such statement." *Id*. (referred to as the "voucher rule"). Because Palafox admitted to the murder but provided an exculpatory statement regarding the robbery (that it was actually staged), the State needed to disprove Palafox's confession beyond a reasonable doubt. *Id*. The State failed to meet its burden; therefore, the court concluded the evidence was insufficient to support the conviction. *Id*. at 183.

*Palafox* and the "voucher rule," however, are no longer controlling authority. *See Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992); *Lee v. State*, 964 S.W.2d 3, 9 (Tex.

App.—Houston [1st Dist. 1997, pet. ref'd) (noting that the rationale behind the voucher rule is effectively destroyed by rule of evidence 607 and the State is no longer bound by exculpatory statements, as a jury is free to accept portions as true and reject the rest). Thus, despite testimony that Layton tried to stage a robbery, the jury was free to conclude otherwise. After all, except for Grada's purse, Layton kept the other items from the house, indicating he took the items for his own personal gain rather than staging a robbery.

Moreover, while the State did not need to prove a motive, it was common knowledge Grada supported Layton and he was an unemployed, drug addict. He considered Grada his "money hole," and knew she had recently come into money from the sale of another property in Granbury. He expressed to others his hatred for Grada and told them about the inheritance he would receive upon her death. As such, a reasonable jury could have determined that at the time of, or prior to the murder, Layton intended to obtain or maintain control of Grada's property, and that the murder, therefore, occurred in the course of robbery. *See Nelson v. State*, 848 S.W.2d 126, 132 (Tex. Crim. App. 1992) (concluding evidence supported a murder in the course of committing robbery when the defendant was in financial difficulties, which indicated a possible motive for the crime, and likely took valuables to support a drug habit).

In addition to his argument that the State failed to present sufficient evidence that the robbery was committed in the course of a murder, Layton also argues the record fails to prove Layton took anything without Grada's consent, and in fact, her "generous nature" belies this contention. However, the record also shows Grada's generous nature had limits. She had specifically set up a trust in her will allowing Layton access to only monthly installments of money. Layton also admitted he had one of her credit cards that he was only to use in emergencies. These limitations indicated Grada did not allow Layton to have free reign over her possessions.

Further, Layton's statements to police contradict his assertion that he had permission to take property from Cross Bend. Specifically, he told officers that coins and money were in the safe; however, these items were removed. If Layton had permission to take these items, he would have no need to lie to police about their location. In addition, the coins were items Grada "prided in" so it was unlikely she would have given them to Layton, knowing he would likely pawn them for drugs.

Accordingly, we conclude a rational jury could have found Layton committed murder in the course of committing robbery. Thus, the evidence is legally sufficient to support his conviction. We overrule Layton's first issue.

### Accomplice Witness Testimony

In his second issue, Layton argues the testimony of Kubasta, an accomplice witness, was without sufficient corroboration to support his conviction. Further, he asserts any other evidence connecting him to the murder equally connects Kubasta to the crime. The State responds evidence other than Kubasta's testimony connected Layton to Grada's murder.

A conviction cannot rest on the testimony of an accomplice unless corroborated by other evidence "tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Under this rule, the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt, rather there simply needs to be other evidence tending to connect the defendant to the offense. *Id*. We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence

that tends to connect the accused to the offense. *Medrano v. State*, 421 S.W.3d 869, 883 (Tex. App.—Dallas 2014, pet. ref'd). "Judicial experience shows no precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice." *Id.*

Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993); *see also Franklin v. State*, No. 05-11-00990-CR, 2012 WL 4801522, at *4 (Tex. App.—Dallas Oct. 10, 2012, no pet.) (not designated for publication) (noting non-accomplice testimony placed defendant at or near the scene of the crime at or about the time of its commission under suspicious circumstances). Here, neighbors saw Layton at Grada's home near the time of the murder, which he lied about. Security footage showed Layton in Benbrook, which is between Plano and Granbury, near the suspected time of Grada's murder.

Proof that connects a defendant to a weapon similar to that used in the offense is another circumstance considered when determining the sufficiency of evidence to corroborate the accomplice. *Hernandez v. State*, 939 S.W.3d 173, 178 (Tex. Crim. App. 1997). Layton knew where Grada kept her .38 special and admitted to shooting it on a prior occasion. In fact, he said during the police interview, it had "a hell of a kick." The last place he recalled seeing it was Grada's living room, the same place she was found dead. The medical examiner and ballistics expert confirmed Grada was shot with a .38. Further, a file found at Bronco was likely used to alter the bullets that killed Grada. The file had smudges in several locations and the soft, gray material appeared to be the same type of material the bullets were made of.

Before investigators confirmed Grada died from gunshot wounds, Layton revealed to Shellie that Grada had been shot. Layton shared this information on the evening of May 30.

–14–

However, Officer Poligala testified that based on the level of decomposition, it was hard to determine the cause of death when they first discovered the body. Sergeant Boese also testified he could not tell if Grada's head and chest injury were caused by gunshot wounds. However, Layton knew the cause of death.

Although Layton argues much of the non-accomplice testimony equally could connect Kubasta to the crime, "when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to the view of the evidence chosen by the fact-finder." *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Patterson v. State*, No. 05-13-00450-CR, 2015 WL 2400809, at *6 (Tex. App.—Dallas May 19, 2015, no pet. h.) (not designated for publication) (concluding that despite conflicting testimony, the jury was free to believe one version over the other and the non-accomplice testimony tended to connect defendant to offense). Thus, viewing the non-accomplice evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found the non-accomplice evidence tended to connect Layton to the offense. Accordingly, we overrule Layton's second issue.

## Conclusion

Having overruled Layton's issues, we affirm the trial court's judgment.


Do Not Publish
TEX. R. APP. P. 47
131510F.U05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS GRADY LAYTON, Appellant

No. 05-13-01510-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 366-82182-10.
Opinion delivered by Justice Bridges.
Justices Fillmore and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered June 8, 2015.